*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0096P (6th Cir.)
File Name: 00a0096p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

LORRIE ANN HORNER, by and through her father nfr Haskel Horner; JENNIFER BAKER, by and through her father nfr Douglas Baker; JULIANA BROWN, by and through her father nfr Michael Brown; ANGELLA CHAFFIN, by and through her father nfr Dale Chaffin; TRACY DOTSON, by and through her father nfr Sherman Dotson; JACQUELINE ELSTON, by and through her father Joseph Elston; AMY HACKER, by and through her father nfr Chris Hacker; ELIZABETH SUZANNE HARTLAGE, an adult; KELLY JOHNSON, by and through her father nfr Charles Johnson; MARY CHRISTINE WHITELOCK, an adult,
　　　　　*Plaintiffs-Appellants,*

LESLIE BURGETT, by and through her father nfr Billy

No. 97-6264

Burgett; BARRIE WAGERS, by
and through her father nfr
Lyde Wagers,
                    *Plaintiffs,*

            v.

KENTUCKY HIGH SCHOOL
ATHLETIC ASSOCIATION;
KENTUCKY STATE BOARD
FOR ELEMENTARY AND
SECONDARY EDUCATION,
          *Defendants-Appellees.*

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 92-00295—Edward H. Johnstone,
Senior District Judge.

Argued:  February 3, 1999

Decided and Filed:  March 20, 2000

Before:  JONES, NORRIS, and SUHRHEINRICH, Circuit
Judges.

_____

**COUNSEL**

**ARGUED:**  Gregory W. Butrum, Louisville, Kentucky, for
Appellants.  Danny C. Reeves, GREENEBAUM, DOLL &
McDONALD, Lexington, Kentucky, Robert E. Stopher,
BOEHL, STOPHER & GRAVES, Louisville, Kentucky, for
Appellees. **ON BRIEF:**  Donald E. Armstrong, Louisville,
Kentucky, for Appellants.  Danny C. Reeves, Roger G.

Wright, GREENEBAUM, DOLL & McDONALD, Lexington, Kentucky, Robert E. Stopher, BOEHL, STOPHER & GRAVES, Louisville, Kentucky, for Appellees.

SUHRHEINRICH, J., delivered the opinion of the court, in which NORRIS, J., joined. JONES, J. (pp. 26-41), delivered a separate dissenting opinion.

---

## OPINION

---

SUHRHEINRICH, Circuit Judge. Plaintiffs, a group of female student athletes attending Kentucky high schools, appeal following remand from the district court's order granting summary judgment to Defendant state school board and school athletic association on Plaintiffs' claim of sexual discrimination under Title IX of the Education Amendments of 1972, as amended by the Civil Rights Restoration Act of 1987 (20 U.S.C. §1681) ("Title IX"). Plaintiffs also appeal the denial of their post-judgment motion for attorneys' fees. We **AFFIRM.**

### I. BACKGROUND

In 1992, Plaintiffs sued Defendants Kentucky High School Athletic Association ("Association") and the Kentucky State Board for Elementary and Secondary Education ("Board"), claiming that the Association's failure to sanction fast-pitch softball violated the Equal Protection Clause of the Fourteenth Amendment, 42 U.S.C. §1983, Title IX, Section 3 of the Constitution of the Commonwealth of Kentucky, and Title XXVII, Labor and Human Rights, Chapter 344, Civil Rights (Ky. Rev. Stat. Ann. § 344.020(1)(b) (Banks-Baldwin 1997)). Specifically, Plaintiffs alleged that Defendants' failure to sponsor fast-pitch softball for female students diminished the ability of female student athletes to compete for college fast-pitch softball athletic scholarships when compared with male student athletes who played high school

baseball and then competed for college baseball athletic scholarships. Plaintiffs requested declaratory and injunctive relief sanctioning fast-pitch softball for girls, compensatory damages, certification as a class, attorneys' fees, and costs.

The Board and Association defended on the basis of its "25 percent" rule, whereby a new sport would not be sanctioned unless at least 25 percent of the member schools indicated a willingness to participate. At the time the lawsuit was filed, two surveys, in 1988 and 1992 respectively, revealed that the member schools indicated only a 9 percent (1988) and a 17 percent (1992) interest in fast-pitch softball for girls.

The district court granted Defendants' motions for summary judgment, holding that: (1) Defendants had complied with Title IX because they had offered equal opportunities in accordance with the interests and abilities of students; and (2) Defendants had complied with the Equal Protection Clause because they permitted students to participate in sanctioned sports without gender restriction. Plaintiffs appealed, and this Court affirmed in part and reversed in part. *See Horner v. Kentucky High School Athletic Ass'n,* 43 F.3d 265 (6th Cir. 1994) (*Horner I*).

*Horner I* affirmed the judgment for Defendants on Plaintiffs' equal protection claim because Plaintiffs failed to prove that Defendants intentionally discriminated against them, as required by the Equal Protection Clause. *See id*. at 276. The court held that Plaintiffs had not alleged that Defendants adopted or adhered to the 25 percent rule because of rather than in spite of its disparate impact on females and that sheer disparate impact is insufficient to demonstrate an equal protection violation. The *Horner I* panel reversed the judgment for Defendants on Plaintiffs' Title IX claim, however, finding that issues of fact "abound[ed]." *See id*. at 275.

While Plaintiffs' first appeal was pending in this Court, the Kentucky General Assembly amended the statute regulating

discriminatory effect is a requirement of Title IX. Because Defendants are charged with knowledge of the law, but did not recognize fast-pitch softball until 1994, it follows that remand is appropriate to determine whether Defendants were deliberately indifferent to Plaintiffs' Title IX rights.

For the foregoing reasons, I would reverse the district court's dismissal of Plaintiffs' claims of monetary relief and remand for a determination of whether Defendants were deliberately indifferent to Plaintiffs' Title IX rights in accordance with *Davis*. I would also reserve judgment as to whether Plaintiffs were "prevailing parties" for attorney fees purposes until after the remand.

## V.

Because I believe that the basis for the majority's affirmance is contrary to the remedial purposes of Title IX, I dissent.

---

119 S.Ct. at 1671.

IX. *See Title IX of the Education Amendments of 1972; A Policy Interpretation; Title IX and Intercollegiate Athletics,* 44 Fed. Reg. 71,413 (Dec. 11, 1979).[4]   The Policy Interpretation explicitly states that a finding of compliance or noncompliance with Title IX would be based in part on whether the federal funding recipient's athletic programs "are discriminatory in language or effect[.]" *Id.* at 71,417, 71,418; *see also* 34 C.F.R. § 106.41(c)(1) ("[w]hether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes" is to be considered for Title IX compliance).   These regulations provided clear notice to defendants of their Title IX obligations. *See Davis,* 119 S.Ct. at 1671, 1673 (Title IX regulations inform federal funding recipients of their contractual duties).[5]   Providing an environment free from

---

[4] The Policy Interpretation has been cited with approval by several courts, including this one. *See Horner,* 43 F.3d at 273-74; *Cohen v. Brown Univ.,* 101 F.3d 155, 166 (1st Cir. 1996).

[5] Although similar reasoning with respect to Title VI's regulations failed to garner a majority view in *Guardians, see* 463 U.S. at 628-32 (Marshall, J., dissenting), there is every reason now, in the fullness of subsequent developments, to accord much more force to Justice Marshall's convincing arguments with regard to Title IX. Another reason why the *Alexander* Court limited *Guardians* to Title VI cases was because, by the time § 504 was enacted, Title VI had been in force for nearly a decade. *See Alexander,* 469 U.S. at 294-95 n.11. Title VI's enforcement regulations had incorporated a disparate impact standard, and nearly 40 federal agencies had adopted standards in which Title VI was interpreted to bar programs with a discriminatory impact. *See Guardians,* 463 U.S. at 629-30 (Marshall, J., dissenting). In *Alexander,* the Court theorized that because Congress was well-aware of Title VI regulations prohibiting a discriminatory effect, but took no steps to restrict the remedies available under § 504 (which was based on Title VI), then Congress implicitly rejected an "intentional" standard for § 504 violations. *Alexander,* 469 U.S. at 294-95 n.11. Because Title IX was enacted only one year before § 504, it seems safe to suggest that the same implicit assumption applies to Title IX. Indeed, because *Davis* relies on the Department of Education's Title IX regulations as providing adequate notice to defendants of their Title IX obligations, *Davis* is a validation of Justice Marshall's arguments in the context of Title IX cases. *See Davis,*

---

high school sports. *See* Ky. Rev. Stat. § 156.070(2) (Banks-Baldwin 1995) (effective July 15, 1994).   Where a school offered one of two similar sports, the amended statute directed the Board and the Association to promulgate regulations to offer the sport for which the National Collegiate Athletic Association ("NCAA") offers athletic scholarships.   In response to the passage of § 156.070(2), the Association amended its Bylaw 40, to state:

> If a member school sponsors or intends to sponsor an athletic activity that is similar to a sport for which NCAA members offer an athletic scholarship, the school shall sponsor the athletic activity or sport for which the scholarships are offered. The athletic activities which are similar to sports for which NCAA members offer scholarships are: Girls' fast pitch softball as compared to slow pitch.

KHSAA Bylaws, Div. IV, Bylaw 40.[1]

---

[1] The following language was added to this bylaw, effective for the 1995-96 school year:

> To qualify as having "sponsored" a sport, a school must be able to demonstrate the following:
>
> (1) If similar versions of a particular sport exist and there are differences in the scholarship opportunities at the NCAA level in that sport, a survey must be taken of the student population at reasonable times and places to determine the level of interest in the sport(s).
>
> (2) If said survey reveals sufficient interest to field the normal squad required for play in the particular sport and if any version of the sport is to be played, the school shall make facilities, staff, and other allowances to properly field a team in the version of the sport for which the NCAA members offer scholarships.

KHSAA Bylaw 40 §2(1), (2).

On remand, the district court again granted summary judgment for Defendants. The district court held that: (1) Plaintiffs' claims for class certification, injunctive relief, and declaratory relief under Title IX were moot because of the amendment to Ky. Rev. Stat. Ann. § 156.070; (2) the Title IX claims of Plaintiffs who had graduated were also moot; and (3) Plaintiffs' claims for monetary damages under Title IX failed because Plaintiffs had presented no evidence of intentional discrimination.

Plaintiffs moved to alter judgment and also moved for attorneys' fees. The district court denied both motions. Regarding attorneys' fees, the district court found that Plaintiffs had received no relief on the merits of their claim, and that there was no proof that Plaintiffs had been the catalyst for Defendants' policy change. Plaintiffs appeal.

## II. DISCUSSION

On appeal, Plaintiffs challenge the district court's refusal to grant money damages under Title IX and its denial of their request for attorneys' fees.

### A. Compensatory Damages

Plaintiffs argue that the district court erred in granting summary judgment because the *Horner I* panel did not hold that there was no evidence of intentional discrimination by Defendants regarding Title IX. Plaintiffs further contend that Title IX does not require intentional discrimination to recover damages. Finally, Plaintiffs argue that if monetary damages are premised upon a finding of intentional discrimination, Defendants' gender-based classification meets that standard. We address Plaintiffs' second argument first.

### 1. Intent Requirement

Plaintiffs contend that a lack of intentional discrimination does not always preclude a plaintiff from recovering money damages under Title IX. Plaintiffs' claim notwithstanding,

Defendants have complied with Title IX's equal opportunity mandate." 43 F.3d at 275. On this basis, it reversed the district court's entry of summary judgment for Defendants. Nevertheless, the majority now states that *Horner I* "did not hold that Plaintiffs made out a prima facie case of a Title IX violation," *Ante* at 21, and proceeds to grant summary judgment. I believe that rather than giving *Horner I* its proper effect, this reading simply echoes the dissent in *Horner I*, which also reasoned that because Plaintiffs "did not present a prima facie case of a Title IX violation," summary judgment should have been granted on the Title IX claim. 43 F.3d at 276 (Batchelder, J., dissenting in part). Similarly, when the current majority now concludes that summary judgment is warranted because Plaintiffs have "failed to offer any additional evidence" that Title IX had been violated, it again runs roughshod over the *Horner I* conclusion that there was a sufficient dispute in the record to withstand summary judgment. Yet again, the majority's conclusion more closely adheres to the *Horner I* dissent, which found the record "silent or otherwise inadequate" on the issues "upon which the plaintiffs' case depends," and which castigated the Plaintiffs' statistics showing a disparity between boys' and girls' participation in Kentucky high school sports. 43 F.3d at 277 (Batchelder, J., dissenting in part). In sum, I do not believe this Court should stamp its approval on the district court's clear mishandling of the *Horner I* remand, let alone rewrite the conclusion of *Horner I's* majority in the voice of its dissent.

Second, contrary to the majority, I believe it is certainly possible that the standards of notice and deliberate indifference could be met in this case. Defendants were, after all, the sole entities that could sanction interscholastic sports in Kentucky, and implemented slow pitch softball in 1982. Nor can Defendants argue that they would be unfairly "surprised" by imposition of a monetary award, as were the defendants in *Guardians*. Three years before Defendants sanctioned slow-pitch softball, the Department of Health, Education and Welfare issued its Policy Interpretation of Title

caused by a "neutral policy." In each situation, the student is being denied the use of school resources on the basis of her gender–precisely the evil Title IX was designed to prevent. And in each situation, the defendant is "well aware" of the deprivation of opportunities. It follows that in each situation, monetary relief should be available.

## IV.

Finally, I disagree with the majority's decision to overlook the district court and magistrate court's error below, an error which I believe deprived Plaintiffs of the opportunity to satisfy the deliberate indifference standard. Our reviewing responsibility is to correct error, not rationalize it.

The majority concedes that the magistrate court was "technically incorrect" in holding that the *Horner I* opinion established that there was no intentional discrimination for Title IX purposes as a matter of law. *Ante* at 16. As the majority acknowledges, the original panel held "that there were genuine issues of fact regarding a Title IX violation." *Id.* Yet the magistrate court improperly applied the *Horner I* panel's summary judgment on the equal protection claim to the Title IX claim, concluding, as a matter of law, that there was no intentional discrimination under Title IX. J.A. at 340. It further stated that Plaintiffs had not offered additional evidence regarding intentional discrimination since the remand, and thus declared Plaintiffs' claim for monetary damages "not viable." J.A. at 340. Despite this clear misreading of *Horner I*, rather than remanding for the district court to assess whether Defendants were deliberately indifferent to Plaintiffs' Title IX rights, the majority still finds for Defendants.

I find this result unacceptable. First, I think the majority's discussion improperly revisits and re-decides the dispute already resolved by *Horner I*. Over a dissent, the *Horner I* majority concluded that "genuine issues of material fact abound in this case, and preclude any determination that

proof of intent, however defined, is the *sine qua non* to compensatory relief for any type of Title IX violation. A brief history of the key Title IX cases makes that clear. In all of the relevant cases, the Supreme Court has consistently invoked a "contract" rationale: that under Spending Clause legislation, the relationship between the government and the federal funding recipient is consensual. A recipient should therefore not be subject to money damages unless it has notice that it will be liable for the conduct at issue.

In 1979, the Supreme Court first construed an implied private right of action under Title IX. *See Cannon v. University of Chicago*, 441 U.S. 677 (1979). The Court reasoned that because Title IX was patterned after Title VI of the Civil Rights Act of 1964, which has been construed as containing an implied private right of action, "[t]he drafters of Title IX explicitly assumed that it would be interpreted and applied as Title VI had been [interpreted and applied]." *Id.* at 696. *See also Guardians Ass'n v. Civil Serv. Comm'n of New York City,* 463 U.S. 582, 594 (1983) (plurality) (noting that a major part of the analysis in *Cannon* was "that Title IX had been derived from Title VI, that Congress understood that private remedies were available under Title VI, and that Congress intended similar remedies to be available under Title IX").

The relationship between monetary damages and proof of intent emerged in *Guardians*, a Title VI case. There, Black and Hispanic police officers sued for damages under Title VI, alleging that their layoffs under the police department's last-hired, first-fired policy were discriminatory. The plaintiff officers claimed that the policy disproportionately affected them because they had lower scores on qualifying examinations than White applicants and accordingly were hired later than higher scoring White applicants. Thus, when it came layoffs, Black officers were laid-off before White officers who had been hired before plaintiffs because of their higher qualifying examinations. The district court acknowledged the discriminatory impact of the policy but,

nevertheless, found that the plaintiffs failed to prove that the defendant had acted with discriminatory intent.

The plaintiffs appealed the issue of whether Title VI requires proof of discriminatory intent.  *See id.* at 584. Although a fractured ruling, a majority of the Court held that Title VI supports a private right of action providing limited declarative and injunctive relief for unintentional violations. *See id.* at 602. A different majority of the Court rejected the plaintiffs' argument that monetary damages were available for unintentional discrimination.[2] Although his rationale for this ruling did not gain a majority, Justice White explained that:

> We have also indicated that "make whole" remedies are not ordinarily appropriate in private actions seeking relief for violations of statutes passed by Congress pursuant to its "power under the Spending Clause to place conditions on the grant of federal funds." *Pennhurst State School v. Halderman*, 451 U.S. 1, 15,

---

[2]Justice White explained the fractured votes as follows:

> Despite the numerous opinions, the views of at least five Justices on two issues are identifiable.  The dissenters, Justices BRENNAN, MARSHALL, BLACKMUN, AND STEVENS, join with me to form a majority for upholding the validity of the regulations incorporating a disparate-impact standard. *See* n.2, supra.   A different majority, however, would not allow compensatory relief in the absence of proof of discriminatory intent.   Justice REHNQUIST and I reach this conclusion directly.     *See* Parts II and IV, supra; post, at 3237 (REHNQUIST, J., concurring in the judgment).    Justice POWELL, joined by THE CHIEF JUSTICE, post at 3235, believe that no private relief should ever be granted under Title VI under any circumstances.  Justice O'CONNOR, post, at 3237, would hold that all relief should be denied unless discriminatory intent is proven.  It follows from the views of these latter three Justices that no compensatory relief should be awarded if discriminatory animus is not shown.

*Id.* at 607 n.27 (White, J.).

the present situation." *Ante* at 13.  On the other hand, the majority concludes, *Guardians* is this case's "equivalent." *Id.* Given that *Davis* holds that Title IX's regulations put federal funding recipients on notice of their contractual duties, and given that the regulations state that Title IX is violated when a school's athletic policies are discriminatory in effect, the majority's distinguishing of *Davis* is without significance. Furthermore, I can discern no practical difference between Defendants' "neutral policy" and a university's failure affirmatively to gauge the interest for fast-pitch softball among its student body.  I find it incongruent that liability under the former should be measured by an "animus" standard while the latter by a "deliberate indifference" standard even though both violations arise under the same statute.

I also believe that such a distinction finds no support in *Davis,* as the Court again reminded us that Title IX protects students, not schools:

> Consider, for example, a case in which male students physically threaten their female peers every day, successfully preventing the female students from using a particular school resource–an athletic field or a computer lab, for instance.  District administrators are well aware of the daily ritual, yet they deliberately ignore requests for aid from the female students wishing to use the resource.   The district's knowing refusal to take any action in response to such behavior would fly in the face of Title IX's core principles, and such deliberate indifference may appropriately be subject to claims for monetary damages.

*Davis,* 119 S.Ct. at 1675.  I fail to see why the above rule does not apply to Defendants in this case.  If a Title IX defendant intentionally deprives a student of educational opportunities when it fails to curb harassment caused by third parties, then surely a defendant likewise intentionally deprives students of those opportunities when it fails to rectify athletic inequities

1016 (5th Cir. 1996) (allowing recovery only upon showing that school responded to harassment claims differently on the basis of gender)). Rejecting *Rowinsky* and the very "animus" standard urged by Defendants, the Court held that Title IX "makes clear that . . . students must not be denied access to educational benefits and opportunities on the basis of gender," and that such a denial of benefits is to be measured from a "deliberate indifference" and/or an "actual knowledge" standard. *Id.* at 1675.

In my view, *Davis* makes abundantly clear that the crucial factor determining whether a defendant has intentionally violated Title IX is notice. Besides, *Davis* was hardly a revolutionary opinion. Rather, the decision marks the third time that the Court has articulated a "deliberate indifference" standard for Title IX liability in this decade. Both *Gebser* and *Franklin* involved a Title IX lawsuit filed against a school district after a teacher had sexually abused the student-plaintiff. In *Franklin,* the Court authorized compensatory damages under Title IX for the first time, reasoning that "[t]he point of not permitting monetary damages for an unintentional violation is that the receiving entity lacks notice that it will be liable for a monetary award. The notice problem does not arise in a case such as this, in which intentional discrimination is alleged." *Franklin,* 503 U.S. at 74-75. The Court ruled that the defendant-school district had "intentionally" violated Title IX because school officials were "aware of and investigated [the teacher's] sexual harassment of Franklin and other female students [but] took no action to halt it and discouraged Franklin from pressing charges against [the teacher]." *Id.* at 64-65. Conversely, in a similar situation six years later, the Court held that the defendant had *not* intentionally violated Title IX because it had no notice of the sexual harassment. *See Gebser,* 118 S.Ct. at 1999-2000 (noting that plaintiffs admitted that they could not prevail under an "actual notice" standard).

The majority suggests that the meaning of *Gebser* and *Davis* is unclear because they "are not readily analogous to

101 S. Ct. 1531, 1539, 67 L. Ed.2d 694 (1981). This is because the receipt of federal funds under typical Spending Clause legislation is a consensual matter: the State or other grantee weighs the benefits and burdens before accepting the funds and agreeing to comply with the conditions attached to their receipt. . . .

*Id.* at 596 (White, J.).

In *Franklin v. Gwinnett County Public Schools.,* 503 U.S. 60, 74 (1992), the Supreme Court explicitly established that the implied right of action under Title IX in *Cannon* provides a damages remedy. In *Franklin*, a student sued a school district under Title IX, alleging that the school district knew that she had been sexually harassed by a teacher, but did nothing. The Court held that damages were not available for Title IX violations from the school district unless the discrimination was intentional. Significantly, *Franklin* characterized the holding of *Guardians* the following way:

Though the multiple opinions in *Guardians* suggest that the difficulty of inferring the common ground among the Justices in that case, a clear majority expressed the view that damages were available under Title VI in an action seeking remedies for an intentional violation, and no Justice challenged the traditional presumption in favor of a federal court's power to award appropriate relief in a cognizable cause of action.

*Id.* at 70.

Justice White, this time writing for the majority, applied the same Spending Clause analysis to Title IX that he used in *Guardians* under Title VI:

In *Pennhurst State School and Hospital v. Halderman*, . . . the Court observed that remedies were limited under such Spending Clause statutes when the alleged violation was *unintentional*. Respondents and the United States maintain that this presumption should equally apply to

*intentional* violations. We disagree. *The point of not permitting monetary damages for an unintentional violation is that the receiving entity of federal funds lacks notice that it will be liable for a monetary award. . . .* This notice problem does not arise in a case such as this, in which intentional discrimination is alleged.

*Franklin*, 503 U.S. at 74-75 (citation omitted) (emphasis added). *Franklin* did not, however, define the contours of the school district's liability in such a situation.

*Gebser v. Lago Vista Independent School District*, 524 U.S. 274, 118 S. Ct. 1989 (1998) took up that task. *See id.* at __, 118 S. Ct. at 1995. There the Court held that a school district may be held liable for damages under Title IX, but only if the district had "actual notice" and was "deliberately indifferent" to the underlying violation. *See id.* at 1999. In *Gebser*, a high school student and her parents sued a school district for damages under Title IX, alleging that a teacher sexually harassed her. The Supreme Court rejected the use of agency or negligence principles to render the school district liable for monetary damages under Title IX. *See id.* at 1997 ("we conclude that it would 'frustrate the purposes' of Title IX to permit a damages recovery against a school district for a teacher's sexual harassment based on principles of respondeat superior or constructive notice, i.e., without actual notice to a school district official"). Observing once again that Title IX was modeled after Title VI, Justice O' Connor, writing for the majority, invoked the "contract" rationale of *Guardians*:

Title IX's contractual nature has implications for our construction of the scope of available remedies. When Congress attaches conditions to the award of federal funds under its spending power, as it has in Title IX and Title VI, we examine closely the propriety of private actions holding the recipient liable in monetary damages for noncompliance with the condition. Our central concern in that regard is with ensuring "that the receiving

Finally, and most significantly, the Court was recently presented in *Davis* with an opportunity to apply the animus standard as a requisite for monetary recovery under Title IX, but instead ruled that a "deliberate indifference" standard would support a finding of intentional discrimination. In *Davis,* the plaintiff brought a Title IX action after her complaints of sexual harassment by a fellow classmate were ignored by school officials. *See Davis,* 119 S.Ct. at 1666-67. The Court noted that the circuits were split for the standard of intentional discrimination in Title IX sexual harassment cases, and that one circuit had endorsed the "animus" standard for monetary recovery in Title IX cases. *See id.* at 1668-69 (citing *Rowinsky v. Bryan Indep. Sch. Dist.,* 80 F.3d 1006,

---

1982) (compensatory relief available for § 504 plaintiff; complaint gave defendants adequate notice that they were charged with violating federal antidiscrimination mandates); *Love v. McBride,* 896 F. Supp. 808, 810 (N.D. Ind. 1995) (refusing to accommodate plaintiff despite repeated requests for access amounted to intentional discrimination), *aff'd* 103 F.3d 558 (7th Cir. 1996).

In each of these cases, the federal funding recipient denied equal opportunity to the § 504 plaintiff by refusing to provide an accommodation for the plaintiff's disability. Surely there was no "animus" against the disabled plaintiff either individually or as a class in these cases. Rather, these defendants were "indifferent" to their federal obligations– very much like defendants in Title IX athletic cases. Nonetheless, the statutory violations were still "intentional" because the defendants had full knowledge of their own discriminatory conduct. As the Second Circuit explained:

[I]ntentional discrimination may be inferred when a "policymaker acted with at least deliberate indifference to the strong likelihood that a violation of federally protected rights will result from the implementation of the [challenged] policy . . . [or] custom." *Ferguson v. City of Phoenix*, 931 F. Supp. 688, 697 (D. Ariz. 1996), *aff'd and remanded,* [157 F.3d 668 (9th Cir. 1998)] . . . ; *see also Canton v. Harris*, 489 U.S. 378, 385, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989).

*Bartlett,* 156 F.3d at 331. The Second Circuit's understanding of "intentional discrimination" is in perfect accordance with the Supreme Court's decision in *Davis.*

1999);[2] *Moreno v. Texas Southern Univ.,* 573 F. Supp. 73, 77 (S.D. Tex. 1983) (recognizing that Justice White's opinion on damages was not the opinion of the Court); *Tyler v. City of Manhattan,*118 F.3d 1400, 1414 (10th Cir. 1997) (Jenkins, J., dissenting).

My position that Justice White's opinion must be kept within its proper bounds is further supported by subsequent Supreme Court decisions. A unanimous Court explained the *Guardians* holding in an opinion issued the following term: "A majority of the [*Guardians*] Court agreed that retroactive relief is available to private plaintiffs for all discrimination, whether intentional or unintentional, that is actionable under Title VI." *Consolidated Rail Corp. v. Darrone,* 465 U.S. 624, 630 n.9 (1984). It seems to me that if the *Guardians* Court did indeed limit compensatory relief to cases of intentional discrimination involving discriminatory animus, such a limitation would have been acknowledged in *Consolidated Rail Corporation'*s explanation of *Guardians. See Bartlett,* 970 F. Supp. at 1148-49. Additionally, another unanimous Court explicitly limited *Guardians* to situations involving "factors peculiar to Title VI" when it refused to read an intent requirement in § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*, which was another Spending Clause antidiscrimination statute, *See Alexander v Choate,* 469 U.S. 287, 294-95 n.11 (1985).[3]

---

[2]*Bartlett* was vacated in light of the Supreme Court's recent decisions limiting the scope of "disability" under the ADA. *See Sutton v. United Air Lines, Inc.,* 119 S.Ct. 2139 (1999); *Murphy v. United Parcel Serv., Inc.,* 119 S.Ct. 2133 (1999); *Albertsons, Inc. v. Kirkingburg,* 119 S.Ct. 2162 (1999). Nevertheless, I still find *Bartlett'*s discussion of damages to be a correct statement of the law.

[3]Incidentally, courts have been very hesitant to hold § 504 plaintiffs to the "animus" standard as a requisite for compensatory relief. *See, e.g., Bartlett,*156 F.3d at 330-31; *Greater Los Angeles Council on Deafness v. Zolin,* 812 F.2d F.2d 1103, 1106-09 (9th Cir. 1987) (allowing action for monetary relief for discriminatory refusal to provide interpreters to deaf plaintiffs); *Miener v. State of Missouri,* 673 F.2d 969, 978-79 (8th Cir.

---

entity of federal funds [has] notice that it will be liable for a monetary award." Justice White's opinion announcing the Court's judgment in *Guardians Assn. v Civil Serv. Comm'n of New York City*, for instance, concluded that the relief in an action under Title VI alleging unintentional discrimination should be prospective only, because where discrimination is unintentional, "it is surely not obvious that the grantee was aware that it was administering the program in violation of the [condition]." We confront similar concerns here. If a school district's liability for a teacher's sexual harassment rests on principles of constructive notice or *respondeat superior,* it will likewise be the case that the recipient of funds was unaware of the discrimination. It is sensible to assume that Congress did not envision a recipient's liability in damages in that situation.

*Gebser*, 118 S. Ct. at 1998 (citations omitted).[3]

---

[3]The *Gebser* court also explained the distinction between Title IX and VII:

That contractual framework distinguishes Title IX from Title VII, which is framed in terms not of a condition but of an outright prohibition. Title VII applies to all employers without regard to federal funding and aims broadly to "eradicat[e] discrimination throughout the economy." *Landgraf v. USI Film Products,* 511 U.S. 244, 254, 114 S. Ct. 1483, 1491, 128 L. Ed.2d 229 (1994) (internal quotation marks omitted). Title VII, moreover, seeks to "make persons whole for injuries suffered through past discrimination." *Ibid.* (internal quotation marks omitted). Thus, whereas Title VII aims centrally to compensate victims of discrimination, Title IX focuses more on "protecting" individuals from discriminatory practices carried out by recipients of federal funds. *Cannon, supra,* at 704, 99 S. Ct., at 1961-62. That might explain why, when the Court first recognized the implied right under Title IX in *Cannon*, the opinion referred to injunctive or equitable relief in a private action, *see* 441 U.S., at 705, and n. 38, 710, n. 44, 711, 99 S. Ct., at 1962, and n. 38, 1964, n. 44, 1965, but not to a damages remedy.

Most recently, in *Davis v. Monroe County Board of Education,* 119 S. Ct. 1661 (1999), the Supreme Court considered whether a damages action under Title IX will lie against a school board for student-on-student harassment. Consistent with its earlier cases, the *Davis* Court held that private damages actions are available only where federal funding recipients act with "deliberate indifference" to "known" acts of harassment. Again, the Court reasoned:

> This Court has indeed recognized an implied private right of action under Title IX, *see Cannon v. University of Chicago, supra,* and we have held that money damages are available in such suits, *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 112 S. Ct. 1028, 117 L.Ed.2d 208 (1992). Because we have repeatedly treated Title IX as legislation enacted pursuant to Congress' authority under the Spending Clause, however, *see, e.g.*, *Gebser v. Lago Vista Independent Schools, supra,* at 287, 118 S. Ct. 1989 (Title IX); *Franklin v. Gwinnett Public County Schools, supra,* at 74-75, and n. 8, 112 S. Ct. 1028 (Title IX), *see also Guardians Assn. v. Civil Serv. Comm'n of New York City*, 463 U.S. 582, 598-99, 103 S. Ct. 3221, 77 L.Ed.2d 866 (1983) (opinion of White, J.) (Title VI), private damages actions are available only where recipients of federal funding had adequate notice that they could be liable for the conduct at issue. When Congress acts pursuant to its spending power, it generates legislation "much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions." *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 17, 101 S. Ct. 1531, 67 L.Ed.2d 694 (1981). In interpreting language in spending legislation, we thus "insis[t] that Congress speak with a clear voice, "recognizing that "[t]here can, of course, be no knowing acceptance [of the

*Gebser*, 118 S. Ct. at 1997-98.

unintentional discrimination.[1] Of the seven opinions filed in that case, only Justice White's opinion suggested a *standard* for "intentional discrimination." *See id.* at 584 ("I conclude that . . . in the absence of proof of discriminatory animus, compensatory relief should not be awarded to private Title VI plaintiffs") (White, J.); *id.* at 607 n.27 (same). Only one other justice joined Justice White on this issue. *See id.* at 612 (Rehnquist, J., concurring in the judgment). Indeed, this Court has already declined to take an expansive reading of Justice White's opinion in *Guardians* for the very reason that it did not command a majority of the Court. *See Neighborhood Action Coalition v. Canton, Ohio,* 882 F.2d 1012, 1015 (6th Cir. 1989); *see also Bartlett v. New York State Bd. of Law Exam'rs,* 970 F. Supp. 1094, 1148-49 (S.D. N.Y. 1997), *aff'd in relevant part,* 156 F.3d 321 (2d Cir. 1998), *vacated on other grounds,* 67 U.S.L.W. 3783 (June 24,

---

[1] Justice White summarized the various votes as follows:

> Despite the numerous opinions, the views of at least five Justices on two issues are identifiable. The dissenters, JUSTICES BRENNAN, MARSHALL, BLACKMUN, and STEVENS, join with me to form a majority for upholding the validity of the regulations incorporating a disparate-impact standard. *See* n. 2, *supra*. A different majority, however, would not allow compensatory relief in the absence of proof of discriminatory intent. JUSTICE REHNQUIST and I reach this conclusion directly. See Parts III and IV, *supra*; *post*, at 612 (REHNQUIST, J., concurring in judgment). JUSTICE POWELL, joined by THE CHIEF JUSTICE, *post*, at 608-610, believes that no private relief should ever be granted under Title VI under any circumstances. JUSTICE O'CONNOR, *post*, at 615, would hold that all relief should be denied unless discriminatory intent is proved. It follows from the views of these three latter Justices that no compensatory relief should be awarded if discriminatory animus is not shown.

*Id.* at 463 U.S. at 607 n. 27 (White, J.).

athletic opportunities are more often–if not always– the result of misperceptions, ignorance, or an unwillingness to alter the status quo rather than a conscious decision to treat women differently because they are women. Because the "animus" standard ensures that Title IX defendants will be virtually impervious to a money judgment, they have little incentive to rectify any inequities in their athletic programs until judicially directed. Instead, the "animus" standard allows defendants to remain blissfully ignorant of their Title IX obligations with little fear of having to pay damages for depriving their students of equal athletic opportunities. For this reason, I believe the standard is antithetical to the remedial purposes of Title IX, frustrating, rather than promoting, the Act's central goals *See Gebser,* 118 S.Ct. at 2005 (Stevens, J., dissenting).

## III.

Moreover, I believe the standard itself rests on flimsy legal ground. The sole source for the "discriminatory animus" standard is Justice White's plurality opinion in *Guardians,* 463 U.S. at 584-607 (White, J.). In *Guardians,* a class of minority civil employees in New York City brought an action under Title VI of the Civil Rights Act of 1964, contending that the city's "last hired, first fired" policy had a disparate effect on minority workers.

The issue in *Guardians* was "whether proof of discriminatory intent [was] required to establish a violation of Title VI[.]" *Id.* at 615 (Marshall, J., dissenting). Seven opinions were filed in the *Guardians* case, in which a consensus emerged twice. First, a majority of the Court agreed that injunctive and declaratory relief were available for so-called "unintentional" violations of Title VI. Second, a different majority of the Court rejected the workers' argument that monetary damages were recoverable in cases of

terms of the putative contract] if a State is unaware of the conditions [imposed by the legislation] or is unable to ascertain what is expected of it." *Ibid*; *see also id.*, at 24-25, 101 S. Ct. 1531.

*Id.* at __, 118 S. Ct. at 1669-70. *Davis* thus extended the rule of *Gebser* to student-on-student sexual harassment when the school officials are aware of the misconduct but do nothing to stop it, despite its ability to exercise control over the situation.

In sum, although the Supreme Court has not yet expressly ruled on the point, we think that it would likely hold that proof of intentional discrimination is a prerequisite for money damages under Title IX when a facially neutral policy is challenged under a disparate impact theory. As the preceding discussion illustrates, the Supreme Court has consistently applied Justice White's Spending Clause analysis as first articulated in *Guardians* in its Title IX decisions. Given the consensual relationship between federal agency and recipient, the recipient must be aware of the conditions attached to the receipt of those funds. As Justice White remarked in *Franklin*, "The point of not permitting monetary damages for an unintentional violation is that the receiving entity of federal funds lacks notice that it will be liable for a monetary award." *Franklin*, 503 U.S. at 74. The dissent, in suggesting that we are ignoring Title IX's remedial purposes, completely ignores this countervailing interest, which the intent requirement seeks to accommodate. Thus, we conclude that compensatory damages under Title IX are available when a facially neutral policy is challenged only if an intentional violation is shown.

This leaves the question of what standard to apply to determine intent when a facially neutral policy is challenged. Currently, the only clear test in the Supreme Court is that of "deliberate indifference." However, the cases from which that test arose, *Franklin, Gebser,* and *Davis,* all address deliberate indifference to sexual harassment, and are not readily analogous to the present situation. *See Pederson v.*

*Louisiana State Univ.*, ___ F.3d ___, Nos. 94-30680, 95-30777, 96-30310, 97-30427, 97-30719, 2000 WL 19350, at * 21 (5th Cir., Jan. 27, 2000). In those cases the school district was sued for its failure to prevent its agents from sexually harassing a student (or engaging in some other form of misconduct). Thus, "intent" in that context means "actual notice" of the abuse by a third party and a failure to stop it.

This case is the Title IX equivalent of *Guardians.* In *Guardians,* the district court acknowledged the disparate impact of the defendant police department's employment policies but did not impose liability for damages because the policies were not intentionally discriminatory. However, as the dissent notes, only Justice White advocated a standard for intentional discrimination when a facially neutral policy is challenged, that of "discriminatory animus." *See Guardians*, 463 U.S. at 584 (White, J.) ("I conclude that . . . in the absence of proof of discriminatory animus, compensatory relief should not be awarded to private Title VI plaintiffs"); *id.* at 607 n.27 (same). The dissent nonetheless advocates the "deliberate indifference" of *Franklin, Gebser,* and *Davis;* and criticizes the discriminatory animus standard as "overdemanding," "near[ly] insurmountable," and "antithetical to the remedial purposes of Title IX."

We can envision various scenarios in which the discriminatory animus and deliberate indifference tests might help establish "intent" under Title IX when a facially neutral policy is challenged.[4]    However, because of Plaintiffs'

---

[4]For example, a deliberate indifference test might be appropriate when Plaintiffs claim that defendant school officials had actual knowledge of the disparate impact of their policies, either at the time of enactment or when subsequently brought to their attention post-enactment, and turn a blind eye. We can also perceive school officials adopting a policy simply because of gender bias, without empirical evidence of disparate effect. In this situation, we do not think that the deliberate indifference test works, because it would be difficult for Plaintiffs to prove actual knowledge of disparate impact. The discriminatory animus test, albeit a stricter standard, might help Plaintiffs

Yet, purported "unintentional" violations of Title IX are pervasive in our educational institutions even a quarter-century after the statute's enactment. While much has changed for female athletes since the passage of Title IX, much remains the same. According to the Department of Education, in 1997,

[a]t the high school level, there are still about 24,000 more boys' varsity teams than girls' teams; in college, women receive only one-third of all athletic scholarships; and, between 1992 and 1997, overall operating expenditures for women's college sports programs grew only 89 percent, compared to 139 percent for men, representing only 23 percent of the total operating expenses.

United States Department of Education, *Title IX: 25 Years of Progress*, Part 6 (1997). Another study conducted on Title IX's Silver Anniversary concluded that while there had been "significant gains" in athletic opportunities for female college students,

these gains still leave girls and women without their fair share of opportunities to compete. Only 9 percent of Division I colleges provide athletic opportunities for women within 5 percentage points of women's share of enrollment. Even among Division I schools that do not sponsor football, only 16 percent even come close to providing women with athletic opportunities in proportion to women's enrollment in the student body.

National Women's Law Center, *Title IX at 25: Report Card on Gender Equity* (1997). This study gave educational institutions an overall grade of "C" for Title IX compliance in athletic programs. *Id.*

Despite these recent statistics, I am not aware of any Title IX athletic-equality case in which the plaintiff could have met the overdemanding "animus" standard of intentional discrimination. As explained above, gender inequities in

available remedies in Title IX cases.  *See Franklin,* 503 U.S. at 72.  Indeed, in 1986, Congress even abrogated the states' Eleventh Amendment immunity in Title IX cases.  *See id.* Thus, the remaining question is whether an award of damages to Plaintiffs in this case would frustrate the purposes of Title IX.

In dicta, the majority appears to agree with Defendants' argument that the "discriminatory animus" standard is appropriate here.  The Supreme Court has defined a discriminatory animus towards women as having "a purpose that focuses upon women by reason of their sex . . . directed specifically at women as a class."  *Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 269-70 (1993).  I believe that, short of a defendant actually defying a court injunction, the "animus" standard will almost never be met in a Title IX athletic-equity case.  *Cf. Guardians Ass'n v. Civil Serv. Comm'n of New York City,* 463 U.S. 582, 632 (1983) (Marshall, J., dissenting).

The excuses for not maintaining gender equity in scholastic athletic programs are all too familiar.  School administrators usually justify differences in athletic opportunities between the sexes because of a misperceived lack of interest or ability among female athletes, or because of a belief that altering the status quo in athletic programs is not worth the inconvenience or expense.  *See generally Cook v. Colgate Univ.,* 802 F. Supp. 737, 746-50 (N.D. N.Y. 1992) (addressing various defenses for college's failure to grant varsity status to women's hockey team), *vacated as moot,* 992 F. 2d 17 (2d Cir. 1993); *Daniels v. School Bd. of Brevard Co., Fla.,* 995 F. Supp. 1394, 1395 (M.D. Fla. 1997) (school board argued that it was too expensive to remedy existing inequities between softball and baseball programs); *Pederson v. Louisiana State Univ.,* 912 F. Supp. 892, 918 (M.D. La. 1996) (Title IX violations were "result of arrogant ignorance, confusion regarding the practical requirements of the law, and a remarkably outdated view of women and athletics which created the by-product of resistance to change").

fundamental failure to establish a violation of Title IX, let alone an intentional violation,[5] we need not adopt any test at this time.  This brings us to Plaintiffs' second contention.

## 2. Plaintiffs' Proofs

In holding that Plaintiffs's Title IX claim for compensatory damages failed for lack of proof of intentional discrimination, the district court held that:

It is clear, as a matter of the law of the case, that there was no intentional discrimination by defendants in this case.  *Horner v. Kentucky High School Ass'n.*, 43 F.3d 265, 276 (6th Cir. 1994).3

[FN]3 The Sixth Circuit determined that plaintiffs failed to offer sufficient evidence on the issue of intentional discrimination to defeat defendants'

---

establish the requisite intent.

Recently, the Fifth Circuit held that the deliberate indifference test applied in Title IX sexual harassment cases "ha[s] little relevance" in determining whether an academic institution intentionally discriminated on the basis of sex by failing to accommodate female athletes.  *See Pederson v. Louisiana State Univ.*, ___ F.3d ___, Nos. 94-3068, 95-30777, 96-30310, 97-30427, 97-30719, 2000 WL 19350, at * 21 (5th Cir., Jan. 27, 2000).  According to *Pederson*, "[t]he proper test is not whether [the school district] knew of or is responsible for the actions of others, but whether [the school district] intended to treat women differently on the basis of their sex by providing them unequal athletic opportunity."  *Id.* As the *Pederson* court observed, classifications based on "archaic" assumptions are facially discriminating, and "actions resulting from an application of these attitudes constitutes intentional discrimination."  *Id.* at * 20.  However, as discussed, this case offers no *proof* of intentional discrimination.

[5]For this reason, we disagree with the dissent's contention that "[a]n answer to [the] question [of whether the district court correctly concluded that the plaintiffs produced no evidence of "intentional discrimination"] will depend entirely on the definition of 'intentional discrimination' within the meaning of Title IX."

motion for summary judgment on the Equal Protection Claim. Plaintiffs have not offered any additional evidence regarding intentional discrimination since the case was remanded from the Sixth Circuit.

(J.A. 340.)[6]  Plaintiffs contend that this ruling is wrong because the *Horner I* panel's ruling pertained only to their Equal Protection Claim; and furthermore, that the Sixth Circuit explicitly held that Plaintiffs had made their prima facie case under Title IX.

Plaintiffs are correct that the ruling in *Horner I* regarding intentional discrimination pertained only to their equal protection claim. Thus, the district court was technically incorrect in holding that the original panel's decision was "law of the case" as to Plaintiffs' Title IX claim. Given the *Horner I* panel's holding that there were genuine issues of fact regarding a Title IX violation in the first place, a ruling that there was no evidence of intentional discrimination under Title IX would have been premature. This, however, brings

---

[6]In the first appeal of this case, this Court, relying on *Personnel Administrator v. Feeney,* 442 U.S. 256 (1979), recognized that discriminatory intent requires a showing that the challenged policy was adopted "*because of*, not merely in spite of, its adverse impact on persons in the . . . class." *Horner,* 43 F.3d at 276 (citing *Feeney,* 442 U.S. at 279) (emphasis added).

Applying this rule, the *Horner I* panel ruled that:

    Plaintiffs did not allege that defendants adopted or adhered to the 25 percent rule because of rather than in spite of its disparate impact on females. Nor did they come forward with evidence of discriminatory intent, such as a tainted historical background of the rule, or a circumstantially suspicious sequence of events leading up to the rule. In short, plaintiffs claimed only that sheer disparate impact was sufficient to demonstrate an equal protection violation. This simply was not enough to defeat the defendants' motion for summary judgment.

*Id.* (internal citation omitted).

---

*Chicago,* 441 U.S. 667, 696 (1979) ("The drafters of Title IX explicitly assumed that it would be interpreted and applied as Title VI had been during the preceding eight years."). The Supreme Court has observed that the primary purposes of Title IX were (1) "to avoid the use of federal resources to support discriminatory practices;" and (2) "to provide individual citizens effective protection against these practices." *Gebser v. Lago Vista Indep. Sch. Dist.,* 118 S.Ct. 1989, 1997 (1998); *see also Haffer v. Temple Univ.,* 524 F. Supp. 531, 533 (E.D. Pa. 1981) (Title IX was intended to provide "the essential guarantees of equal opportunity in education for men and women") (quoting 118 Cong. Rec. 5808 (1972) (remarks of Sen. Birch Bayh)). There is also no doubt that Congress fully intended Title IX to mandate gender equity in scholastic athletic programs. *See id.* at 534-36 (recounting legislative history and subsequent defeat of various measures that would have limited Title IX's impact on athletic programs); *see also* 34 C.F.R. § 106.41(c) (recipients of federal funds must generally provide equality of athletic opportunity to students of both sexes); *Yellow Springs Bd. of Ed. v. Ohio High School Athletic Ass'n,* 647 F.2d 651, 660-61 (6th Cir. 1981) (Jones, J., concurring in part and dissenting in part). Finally, the Supreme Court has recognized that Title IX was enacted pursuant to Congress's spending power. *See Davis,* 119 S.Ct. at 1669-70; *Franklin,* 503 U.S. at 74. By agreeing to accept federal funds, Defendants essentially contracted with the federal government that they would not discriminate on the basis of gender in athletics. *See Gebser,* 118 S.Ct. at 1997.

An implied cause of action exists under Title IX. *See Davis,* 119 S.Ct. at 1669; *Gebser,* 118 S.Ct. at 1996; *Cannon,* 441 U.S. at 717. As noted *supra,* courts are generally free to "make good on the wrong done" when federal rights have been infringed, subject to only two constraints. Courts are limited in granting relief when (1) Congressional intent is to the contrary, or (2) the purposes of carrying out the statute would be frustrated. *See Gebser,* 118 S.Ct. at 1996. It is well-accepted that Congress did not intend to limit the

wrongly concluded that Defendants are entitled to summary judgment on monetary damages. To the contrary, Plaintiffs must be afforded an opportunity to meet the *Davis* standard below.

## II.

The starting point for our analysis should be the seminal decision of *Bell v. Hood,* 327 U.S. 678 (1946) in which the Supreme Court stated the oft-repeated principle that

> where federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief. And it is also well settled that where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done.

*Id.* at 684 (footnotes omitted); *see also Franklin v. Gwinnett Co. Pub. Schs.,* 503 U.S. 60, 70-71 (1992) ("[A]bsent clear direction to the contrary by Congress, the federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute"); *Justice v. Pendleton Place Apartments,* 40 F.3d 139, 143 (6th Cir. 1994) (stating that the burden is on the defendant to demonstrate that Congress did not intend requested relief).

The majority opinion is replete with references to Title IX, but nowhere does it examine closely the statute's provisions. I submit that to engage in a proper analysis, we must look to the Act itself. The pertinent language of Title IX states: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]" 20 U.S.C. § 1681(a). When Title IX was enacted in 1972, it was patterned after Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, which banned racial discrimination in federally funded programs. *See Cannon v. University of*

us to Plaintiffs' contention that our previous decision found that they had stated a prima facie case under Title IX. That is not correct, as an examination of our original decision reveals.

Initially, *Horner I* discussed the analysis to be used in determining whether Defendants had complied with Title IX's equal opportunity mandate.[7] The *Horner I* panel noted that the regulations implementing the statute's nondiscriminatory requirements "do not impose an independent requirement that an institution always sponsor separate teams for each sport it sanctions." *Id.* at 273 (citing 34 C.F.R. § 106.41(b)). The panel also noted that "the regulations do require that institutions provide gender-blind equality of athletic opportunity to its students." *Id.* (citing 34 C.F.R. § 106.41(c)). This requires an evaluation of several factors, including "'[w]hether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes[.]'" *Id.* (quoting 34 C.F.R. § 106.41(c)(1)).

In making this assessment, the *Horner I* panel deferred to the Department of Health, Education, and Welfare's Policy Interpretation of 1979. *See id.* To satisfy the effective accommodation requirement of 34 C.F.R. § 106.41(c)(1), "an institution must effectively accommodate the interests of both sexes in both the selection of the sports and the levels of competition, *to the extent necessary to provide equal athletic opportunity*." *Id.* (citing Policy Interpretation, Section VII.C.1., 44 Fed. Reg. at 71,417) (emphasis added).

Regarding the interests of the students, *Horner I* noted that "the Policy Interpretation instructs that the methods chosen by the institution must be nondiscriminatory and must not disadvantage members of an underrepresented sex." *Id.*

---

[7] Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]" 20 U.S.C. § 1681(a).

(citing Policy Interpretation, Section VII.C.3., 44 Fed. Reg. at 71,417).  The court held:

> The district court found that plaintiffs have an unrestricted opportunity to compete based upon the interests of the member schools.  However, *the interests of the member schools is not necessarily identical with that of the students, a question on which the record is completely silent.*  At best, the record reflects that 17 percent of the member schools were interested in having fast-pitch softball sanctioned.  The interest of female students at other schools is unknown, because there is no information regarding whether the member schools polled their students before responding, or failing to respond, to the KHSAA's survey.

*Id.*  (emphasis added).

Regarding the selection of sports, the *Horner I* panel noted that Title IX Plaintiffs must establish that:

> (1) The opportunities for members of the excluded sex have historically been limited;
> (2) There is sufficient interest and ability among the members of the excluded sex to sustain a viable team and a reasonable expectation of intercollegiate competition for that team; and
> (3) Members of the excluded sex do not possess sufficient skill to be selected for a single integrated team, or to compete actively on such team if selected.

*Id.* at 274 (quoting Policy Interpretation, Section VII.C.4.b., 44 Fed. Reg. at 71,418).

Regarding these factors, the *Horner I* panel held that there was record evidence to support the first requirement, but not the second or third:

> With respect to subsection (1), there is evidence in the record that the opportunities for girls were, and are, more

standing with the college's admissions department by designating the applicant as a "recruit."  Plaintiffs theorized that college softball coaches were reluctant to allocate valuable scholarship monies, or otherwise devote recruiting efforts to Kentucky high school softball prospects, because Kentucky's softball players were untested and unproven in the fast-pitch game.  Kentucky's high school baseball players, of course, faced no such impediments.

Recently, a district court observed in a similar case that "[f]or too long, the girls' softball team has been denied athletic opportunity equal to the boys' baseball team." *Daniels v. School Bd. of Brevard Co., Fla.,* 985 F. Supp. 1458, 1462 (M.D. Fla. 1997).  The primary issue in this appeal is whether the district court correctly concluded that Plaintiffs produced no evidence of "intentional discrimination" as a predicate for an award of compensatory damages.  An answer to this question will depend entirely on the definition of "intentional discrimination" under Title IX. Plaintiffs urge us to apply a "knowledge" or a "deliberate indifference" standard for "intentional" violations of Title IX. Plaintiffs contend that so long as Defendants were aware of the discriminatory effect of their failure to sanction fast-pitch softball, but nevertheless failed to modify their bylaws to comply with Title IX's mandates, then they "intentionally" violated Title IX.  Defendants counter that "intentional discrimination" under Title IX requires a finding of "discriminatory animus" against Plaintiffs' gender.

The majority suggests in dicta that Defendants are likely correct in their choice of standard, but holds that Plaintiffs lose as a matter of law in either case.  I disagree with both conclusions.  First, the Supreme Court has determined that a "deliberate indifference" standard governs whether Title IX is intentionally violated.  *See Davis v. Monroe Co. Bd. of Ed.,* 119 S.Ct. 1661, 1675 (1999).  Further, because the magistrate court clearly misread the holding of *Horner I*, and because I believe the majority essentially rewrites that decision through its reasoning in this case, the majority has, in my judgment,

---

**DISSENT**

---

NATHANIEL R. JONES, Circuit Judge, dissenting. The majority finds it unnecessary to remand this case despite the magistrate court's clear error in applying this Court's holding in *Horner I*. The majority also suggests in dicta that we use a discriminatory animus standard, rather than a deliberate indifference standard, in assessing the deprivation of educational opportunities to Kentucky's female high school softball players. In my view, Supreme Court precedent clearly dictates that we use a deliberate indifference standard in assessing Plaintiffs' claim. I also believe that Plaintiffs should be afforded the opportunity to meet this deliberate indifference standard below--an opportunity of which they were deprived by the magistrate court's misreading of this Court's decision in *Horner I*. Accordingly, I respectfully dissent.

**I.**

We have already delineated the contours of this lawsuit in a previous decision. Although defendant Kentucky High School Athletic Association ("Association") sanctions boys' baseball, it did not recognize "fast-pitch" softball--the practical equivalent of baseball for female athletes--prior to the filing of this lawsuit. *See Horner v. Kentucky High Sch. Athletic Ass'n*, 43 F.3d 265, 269 (6th Cir. 1994). The essence of Plaintiffs' complaint was that because of Defendants' failure to recognize fast-pitch competition in Kentucky high schools, Kentucky's female high school softball players were at a disadvantage in competing for the collegiate benefits and opportunities enjoyed by Kentucky's male high school baseball players. For example, a significant number of colleges offer financial assistance in the form of athletic scholarships for softball players. *See id*. Moreover, it seems a given that many college coaches can improve an applicant's

limited than those for boys. With respect to subsection (2), *the level of interest of all high school girls in fast-pitch softball is unknown*. With respect to subsection (3), the record reflects only that girls are not prohibited from playing on the boys' baseball teams. *The record does not disclose whether and to what extent girls actually play.*

*Id.* at 274 (emphasis added). Thus, contrary to Plaintiffs' assertions on appeal, this court did not hold in *Horner I* that Plaintiffs had met their initial burden.

The panel also set forth the factors in the Policy Interpretation to assess an institution's effective accommodation of the students' interest in the selection of the levels of competition:

(1) Whether the intercollegiate level participation opportunities for males and female students are provided in numbers substantially proportionate to their respective enrollments; or
(2) Where the numbers of one sex have been and are underrepresented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex;
(3) Where the members of one sex are underrepresented among intercollegiate athletes, and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.

*Id.* (quoting Policy Interpretation, Section VII.C.5.a, 44 Fed. Reg. at 71,418).

Regarding these factors, the original panel noted that:

The plaintiffs bear the burden of proof on subsection (1), that of showing statistical disparity.[FN8]  *Roberts*, 998 F.2d at 828; *Cohen*, 991 F.2d at 901.  Substantial proportionality provides a safe harbor for recipients of federal funds. . . . If the plaintiffs prove disparity, then the institution must show that it satisfies subsection (2).  If it fails here, the plaintiffs may prevail by sustaining their burden of proof under subsection (3) and demonstrating an unmet interest on the part of the underrepresented sex.  *Roberts*, 998 F.2d at 830-31; *Cohen*, 991 F.2d at 901.  Subsection (3) "'sets a high standard: it demands not merely some accommodation, but full and effective accommodation.  If there is sufficient interest and ability among members of the statistically underrepresented gender, not slaked by existing programs, an institution necessarily fails this prong of the test.'"  *Roberts*, 998 F.2d at 831-32 (quoting *Cohen*, 991 F.2d at 898).

FN8.  *Although the record is silent on this point*, the court was informed at oral argument that 33,891 boys (65 percent) participate in sanctioned sports in Kentucky, while only 18,860 girls (34.8) percent participate.

*Id.* at 275 (emphasis added).  We therefore concluded that:

It is evident that genuine issues of material fact abound in this case, and preclude any determination that defendants have complied with Title IX's equal opportunity mandate.  We therefore reverse the district court's entry of summary judgment on plaintiffs' Title IX claims.

*Id.*  Again, the *Horner I* panel did not hold that Plaintiffs had met their burden under Rule 56 of the Federal Rules of Civil Procedure.  In fact, we specifically noted that the record was silent on statistical disparity.  The only proof Plaintiffs offered on remand was that of statistical disparity, in support of their

and it is not properly before this Court.  *See USA Petroleum Co. v. Atlantic Richfield.* 13 F.3d 1276, 1284 (9th Cir. 1994).

In short, Plaintiffs have not shown that they are prevailing parties because they did not obtain an enforceable judgment, an injunction, a declaratory judgment, or a consent decree altering the legal relationship between them and Defendants.  Further, based on the record, Plaintiffs have not demonstrated that their lawsuit was an important and necessary factor in changing the law.

### III.  CONCLUSION

Accordingly, the judgment of the district court is **AFFIRMED**.

the denial of a motion for attorneys' fees for an abuse of discretion. *See Jones v. Continental Corp.,* 789 F.2d 1225, 1229 (6th Cir. 1986).

To recover attorneys' fees under 42 U.S.C. § 1988, a party must be a prevailing party. To be a prevailing party, a party must receive at least some relief on the merits of his claim such as a judgment, an injunction, or a consent decree. *See Hewitt v. Helms,* 482 U.S. 755, 760-61 (1987).

Plaintiffs claim that Defendants changed their policies and practices because of their lawsuit. The District Court, however, found no evidence for this claim. The record reflects that Defendants changed their policies only after the Kentucky General Assembly amended Ky. Rev. Stat. § 156.070, directing Defendants to promulgate regulations to provide fast-pitch softball. Plaintiffs offered no record evidence that their lawsuit caused the Kentucky General Assembly to amend Ky. Rev. Stat. § 156.070. The district court's finding that Plaintiffs were not prevailing parties is, therefore, not clearly erroneous.

Nevertheless, a plaintiff who is not a prevailing party under § 1988, may also recover attorneys' fees if the lawsuit was the primary "catalyst" for causing a defendant to change its conduct favorably toward the plaintiff. *See Payne,* 88 F.3d at 397. The catalyst theory applies a two-part test. First, the plaintiff's lawsuit must be a necessary and important factor in achieving the relief sought. Second, the plaintiff must prove that the changed conduct was required because of a violation of the law. *See id.* at 397-98.

Plaintiffs have not demonstrated that their lawsuit was a necessary and important factor in changing the twenty-five percent rule. Plaintiffs offer an affidavit from a member of the Kentucky General Assembly stating that Plaintiffs' counsel advised her on amending Ky. Rev. Stat. § 156.070. However, Plaintiffs did not enter this affidavit into the record

statements at oral argument. Plaintiffs offered no proof on remand that their interests were not being met, despite the policy allowing them to play on boys' fast-pitch softball teams. As the dissent in *Horner I* observed: "Title IX, when read with the implementing regulation and the policy interpretation, places the burden of proving statistical disparity and unmet interest squarely on the shoulders of the plaintiffs." *Id.* at 277 (Batchelder, J., dissenting) (citing *Roberts v. Colorado State Bd. of Agric.*, 998 F.2d 824, 829 n.5 (10th Cir. 1993); *Cohen v. Brown Univ.*, 991 F.2d 888, 901-01 (1st Cir. 1993)).

In sum, the *Horner I* panel did not hold that Plaintiffs made out a prima facie case of a Title IX violation, but merely held that Plaintiffs had established the first requirement of their prima facie case. Notably, the *Horner I* panel specifically advised Plaintiffs of the proof necessary to prevail on their Title IX claim, and granted a remand for further development of the record. Notwithstanding, upon renewed motions for summary judgment by Defendants, other than proof of statistical disparity, Plaintiffs still failed to offer any additional evidence that Title IX's equal opportunity mandate had been violated, let alone intentionally violated. Absent a predicate violation, it is axiomatic that there can be no intentional violation of Title IX. Thus, in the language of the dissent, there can be no "actual notice" and "deliberate indifference" to Plaintiffs' unmet interest. We therefore affirm the district court's grant of summary judgment, although on slightly different grounds.

Nevertheless, even if we assumed that Plaintiffs had established their prima facie case, we would still hold that they failed to establish an intentional violation. Certainly, on this record, there is no evidence of discriminatory animus. *See Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 269-70 (1993) (defining discriminatory animus towards women in an action under 42 U.S.C. § 1885(3) as having "a purpose that focuses upon women by reason of their sex . . . directed specifically at a women as a class"); *Feeney*, 442

U.S. at 279 (stating in the equal protection context that "'discriminatory purpose' . . . implies more than intent as volition or intent as awareness of consequences"). Plaintiffs offered no evidence of discriminatory intent.[8] Nor is there any proof under the dissent's proposed standard. Plaintiffs have simply not established that Defendants had actual knowledge of the discriminatory effect of their facially neutral rule, yet failed to remedy the violation. In any event, Plaintiffs' and the dissent's position is really a "constructive" notice argument under the guise of the deliberate indifference test: Because there was a boys' fast-pitch softball team and not a girls' fast-pitch softball team, Defendants must have known that they were treating girls differently than boys; Defendants, as federal funding recipients, are charged with notice of the Title IX law, which prohibits gender discrimination; Defendants were therefore in knowing violation of Title IX.

This reasoning is flawed because it reads Title IX as requiring perfect parity. However, as just discussed, all the statute and implementing regulations require is equality of athletic opportunity. The statute itself does not require gender balance. *See* 20 U.S.C.A. §1681(b)(West 1990) (providing that "[n]othing contained in subsection (a) of this section shall be interpreted to require any educational institution to grant preferential or disparate treatment to the members of one sex

___

[8] As we noted in the equal protection context in *Horner I*:
Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available. The impact of the official action – whether it "bears more heavily on one race than another," – may provide an important starting point. Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even though the governing legislation appears neutral on its fact. The evidentiary inquiry is then relatively easy. But such cases are rare.

*Horner I*, 43 F.3d at 276 (quoting *Village of Arlington Heights Metropolitan Hous. Dev.Corp.*, 429 U.S. 252, 266 (1977)).

on account of an imbalance which may exist with respect to the total number or percentage of persons of that sex participating in or receiving the benefits of federally supported program or activity, in comparison with the total number or percentage of persons of that sex in any community, State, section, or other area"); *Roberts*, 998 F.2d at 829 n.5. Further, in certain instances, separate teams for males and females are allowed. *See* 34 C.F.R. § 106.41(b) (1998) (permitting separate sports teams for males and females where selection for the team is based on competitive skill or is a contact sport). As we pointed out in *Horner I*, the regulations themselves do not impose an independent requirement that an institution always sponsor separate teams for all sanctioned sports. *See Horner I*, 43 F.3d at 273 (citing 34 C.F.R. § 106.41(b)). Thus, it would be impossible for Defendants to be on notice that they were in violation of Title IX simply because they sponsored only boys' fast-pitch softball. Finally, it is undisputed that Defendants permit female athletes to try out for traditional male sports, including contact sports. Absent any evidence that this opportunity did not adequately meet girls' needs and abilities, there can be no finding that Defendants knowingly violated Plaintiffs' Title IX rights.

### 3. Gender Classification

For the first time on appeal, Plaintiffs argue that Defendants violated Title IX because the KHSAA classifies its sports by gender. For the reasons stated, classification by gender is not a per se violation of Title IX. In any event, the claim is forfeited.

### B. Attorneys' Fees

Plaintiffs also claim that they are prevailing parties for purposes of awarding attorneys' fees. This Court reviews the factual determination that a party is a prevailing party for clear error. *See Payne v. Board of Educ., Cleveland City Schools,* 88 F.3d 392, 397 (6th Cir. 1996). This Court reviews