**Daniel DANIELS, as next friend of Jessica Daniels and Jennifer Daniels, Plaintiffs,**

v.

**SCHOOL BOARD OF BREVARD COUNTY, FLORIDA, Defendant.**

**No. 97–1186–CIV–ORL–22.**

United States District Court, M.D. Florida, Orlando Division.

Nov. 25, 1997.

Lisa Kuhlman Tietig, Tietig & Tietig, Merritt Island, FL, for plaintiff.

Jeffrey Graham Slater, Eubanks, Hilyard, Rumbley, Meier & Lengauer, P.A., Orlando, FL, for defendant.

## ORDER

CONWAY, District Judge.

### I. INTRODUCTION

The Plaintiffs in this action are Jessica and Jennifer Daniels, and their father, Daniel Daniels. Jessica and Jennifer are seniors at Merritt Island High School ("MIHS"). They both are members of the girls' varsity softball team.

Plaintiffs have sued the Defendant, School Board of Brevard County, based on disparities between the MIHS girls' softball and boys' baseball programs. They assert claims pursuant to 20 U.S.C. § 1681 ("Title IX") and the Florida Educational Equity Act, Fla.Stat. § 228.2001 ("the Florida Act").

Plaintiffs seek a preliminary injunction. On November 24, 1997, the Court heard oral argument on the motion. After considering the parties' evidentiary submissions, legal memoranda and arguments, the Court determines that the Plaintiffs are entitled to a preliminary injunction.

### II. PRELIMINARY INJUNCTION STANDARD

"A plaintiff moving for a preliminary injunction must show: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury to the plaintiff outweighs the injury to the nonmovant; and (4) that the injunction would not disserve the public interest." *Statewide Detective Agency v. Miller*, 115 F.3d 904, 905 (11th Cir.1997).

### III. TITLE IX AND THE FLORIDA ACT

Subject to exceptions not pertinent here, Title IX provides:

No person in the United States shall, on the basis of sex, be excluded from partic-

ipation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]

20 U.S.C. § 1681(a).

"Congress enacted Title IX in response to its finding—after extensive hearings held in 1970 by the House Special Subcommittee on Education—of pervasive discrimination against women with respect to educational opportunities." *Cohen v. Brown University,* 101 F.3d 155, 165 (1st Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1469, 137 L.Ed.2d 682 (1997). "Title IX was passed with two objectives in mind: 'to avoid the use of federal resources to support discriminatory practices,' and 'to provide individual citizens effective protection against those practices.'" *Id.* (quoting *Cannon v. University of Chicago,* 441 U.S. 677, 704, 99 S.Ct. 1946, 1961, 60 L.Ed.2d 560 (1979)).

Title IX is implemented with respect to athletic activities by 34 C.F.R. § 106.41. Section § 106.41(a) generally provides:

No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis.

Section 106.41(c) provides:

A recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics shall provide equal athletic opportunity for members of both sexes. In determining whether equal opportunities are available the Director will consider, among other factors:

(1) Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes;

(2) The provision of equipment and supplies;

(3) Scheduling of games and practice times;

(4) Travel and per diem allowance;

(5) Opportunity to receive coaching and academic tutoring;

(6) Assignment and compensation of coaches and tutors;

(7) Provision of locker rooms, practice and competitive facilities;

(8) Provision of medical and training facilities and services;

(9) Provision of housing and dining facilities and services;

(10) Publicity.

Unequal aggregate expenditures for members of each sex or unequal expenditures for male and female teams if a recipient operates or sponsors separate teams will not constitute noncompliance with this section, but the Assistant Secretary may consider the failure to provide necessary funds for teams for one sex in assessing equality of opportunity for members of each sex.

The Florida Act also prohibits, *inter alia,* gender discrimination in public education. It extends protection to those enrolled in public educational institutions which receive or benefit from either state or federal financial assistance. *See* Fla.Stat. § 228.2001(2)(a). The Florida Act lists the identical factors for assessing discrimination in athletics set forth in 34 C.F.R. § 106.41(c)(1)–(10). *See* Fla. Stat. § 228.2001(3)(d)(1)–(10).

## *IV. ANALYSIS*

### *A. Substantial Likelihood of Success on the Merits*

■ Plaintiffs assert that the following inequalities exist at the MIHS softball and baseball facilities, and that these disparities violate Title IX and the Florida Act.

### Electronic Scoreboard

It is undisputed that the boys' baseball field has an electronic scoreboard, and that the girls' field has no scoreboard at all. At the preliminary injunction hearing, Defendant's counsel argued that a scoreboard is inessential to varsity softball play. The Court disagrees. A scoreboard is of obvious benefit to players who must keep track of the score, the innings, and the numbers of outs,

balls and strikes at any given moment. The prestige factor of a scoreboard is also obvious. As with all the differences the Court addresses in this Order, the fact that the boys have a scoreboard and the girls do not sends a clear message to players, fellow students, teachers and the community at large, that girls' varsity softball is not as worthy as boys' varsity baseball.

### Batting Cage

It is also undisputed that the boys' baseball team has a batting cage and the girls' softball team does not. The use of a batting cage sharpens hitting skills. The girls' softball team is technically disadvantaged by the absence of such equipment. At the hearing, Plaintiffs' counsel represented that it would be difficult for the two teams to share one batting cage as a result of differences in the pitching machines each team uses. Accordingly, it appears that sharing the existing batting cage is not feasible.

### Bleachers

Photographs submitted by Plaintiffs starkly illustrate that the bleachers on the girls' softball field are in worse condition, and seat significantly fewer spectators, than the bleachers on the boys' field. In fact, at the preliminary injunction hearing, Defendant's counsel admitted that the girls' bleachers are actually "hand-me-downs" that the boys' team passed on to the girls' team after the boys' team received new bleachers. Again, the message this sends the players, spectators and community about the relative worth of the two teams is loud and clear.

### Signs

A sign reading "Merritt Island Baseball" is emblazoned in very large letters on the side of a portable structure adjacent to the boys' baseball field. The sign faces MIHS' student parking lot. This sign clearly publicizes only the boys' baseball team. Another sign is located just outside the left field fence of the boys' field. This billboard-type sign reads "Home of the Mustangs;" it faces toward the boys' field. Due to its location, the effect of this second sign is to advertise the boys' baseball team. There are no signs publicizing the girls' softball team.

### Bathroom Facilities

There are no restrooms located on the girls' softball field. Restrooms are located on the boys' baseball field. A fence separates the girls' field from the restrooms. There is a dispute concerning whether the coach of the girls' team has been provided with a key to a gate in the fence. Equal access to restroom facilities is such a clearly established right as to merit no further discussion.

### Concession Stand/Press Box/Announcer's Booth

A combination concession stand/press box/announcer's booth is located on the boys' baseball field. There is no such structure on the girls' softball field. These facilities affect player and spectator enjoyment of a sport, as well as attendance.

### Field Maintenance

The photographs submitted by Plaintiffs facially suggest that the girls' softball field is not as well-maintained as the boys' baseball field. However, at the preliminary injunction hearing, Defendant's counsel stated that the photographs were misleading because MIHS was in the process of reconditioning the girls' field at the time the photographs were taken. Defense counsel maintains that the reconditioning process continues. Accordingly, at this juncture, it is difficult for the Court to evaluate the comparative level of field maintenance.

### Lighting

The boys' baseball field is lighted for nighttime play; the girls' softball field is not. Apparently, this single factor was the impetus for this lawsuit.

Nighttime play affects spectator attendance, parental involvement, and player and spectator enjoyment. Nighttime games have a "big league" quality not associated with daytime play. Additionally, lighting affords more flexibility regarding practice scheduling. The absence of lighting on the girls' softball field detrimentally affects the girls' team in all these respects.

After Plaintiffs filed suit, the Brevard County School Board voted to install lighting at MIHS' girls softball field. Plaintiffs con-

tend that have not received assurance that the lighting will be in place by January 26, 1998, the beginning of the girls' season. Defendant's counsel stated at the preliminary injunction hearing that there is every reason to believe that lighting would be installed by that date. Unless the lighting is in place by January 26, 1998, MIHS will be enjoined from using the lights on the boys' baseball field.

The Court determines that the cumulative effect of the inequalities in the two athletic programs is so significant as to give Plaintiffs a substantial likelihood of success on the merits of the Title IX and Florida Act claims. The Defendant has chosen to favor the boys' baseball team with a lighted playing field, a scoreboard, a batting cage, superior bleachers, signs publicizing the team, bathroom facilities, and a concession stand/press box/announcer's booth, but has not seen fit to provide the girls softball team with any of these things. This disparity implicates several of the considerations listed in 34 C.F.R. § 106.41. *See* § 106.41(2) ("provision of equipment and supplies"), (3) ("[s]cheduling of games and practice times"), (7) ("[p]rovision of ... practice and competitive facilities"), (8) ("[p]rovision of ... training facilities"), and (10) ("[p]ublicity"). A balance of the relevant factors favors the Plaintiffs.

■ The Defendant seeks to avoid liability on the basis that it provides equal funding for the boys' and girls' programs. According to the Defendant, each team has a separate booster club which engages in separate fund-raising activities. The Defendant suggests that it cannot be held responsible if the fund-raising activities of one booster club are more successful than those of another. The Court rejects this argument. It is the Defendant's responsibility to ensure equal athletic opportunities, in accordance with Title IX. This funding system is one to which Defendant has acquiesced; Defendant is responsible for the consequences of that approach.

### B. Substantial Threat of Irreparable Injury

■ Plaintiffs have also demonstrated a substantial threat of irreparable injury.

Each day these inequalities go unredressed, the members of the girls' softball team, prospective members, students, faculty and the community at large, are sent a clear message that girls' high school varsity softball is not as worthy as boys' high school varsity baseball, i.e., that girls are not as important as boys. In that regard, Plaintiffs have filed two expert affidavits detailing the effects of such unequal treatment on girls. *See* Dkts. 23 & 25. Further, Jessica and Jennifer are seeking athletic scholarships, many of which, Plaintiffs maintain, are not decided until after the softball season is over. Accordingly, it is critical that the two girls do their best during their final season.

### C. Relative Harm/Public Interest

■ Since these inequalities should have long ago been rectified, the Court is unsympathetic to Defendant's claims that it will be unduly harmed by the expenditure of funds necessary to level the playing field for girls' softball athletes. For too long, the girls' softball team has been denied athletic opportunity equal to the boys' baseball team. The harm associated with that treatment as second-class athletes is significant. In short, the balance of harms favors Plaintiffs. The players and all others associated with these programs, the school system as a whole, and the public at large, will benefit from a shift to equal treatment.

### D. Bond

■ This lawsuit represents a form of public interest litigation. Accordingly, the Court has the discretion not to require Plaintiffs to post security for the issuance of a preliminary injunction. *See City of Atlanta v. Metropolitan Atlanta Rapid Transit Authority,* 636 F.2d 1084, 1094 (5th Cir.1981). The Court will exercise that discretion in this case. No bond will be required of Plaintiffs.

### V. CONCLUSION

■ After careful analysis, the Court determines that Plaintiffs are entitled to a preliminary injunction. At the preliminary injunction hearing, various possibilities of remedying the inequalities at issue were dis-

cussed. Since public funds are at stake, the Court will afford Defendant an opportunity to submit a plan addressing how Defendant proposes to remedy the inequalities identified in this Order, given the Court's determination that a preliminary injunction should issue. Such an approach has been recognized by other courts. *See Cohen v. Brown University,* 101 F.3d 155, 185–88 (1st Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1469, 137 L.Ed.2d 682 (1997).

In submitting its proposal, Defendant should be mindful of Title IX's salutary effects. As the Court of Appeals for the First Circuit recently observed in *Cohen:*

> There can be no doubt that Title IX has changed the face of women's sports as well as our society's interest in and attitude toward women athletes and women's sports. In addition, there is ample evidence that increased athletics participation opportunities for woman and young girls, available as a result of Title IX enforcement, have had salutary effects in other areas of societal concern.

> One need look no further than the impressive performances of our country's women athletes in the 1996 Olympic Summer Games to see that Title IX has had a dramatic and positive impact on the capabilities of our women athletes, particularly in team sports. These Olympians represent the first full generation of women to grow up under the aegis of Title IX. The unprecedented success of these athletes is due, in no small measure, to Title IX's beneficent effects on women's sports, as the athletes themselves have acknowledged time and again. What stimulated this remarkable change in the quality of women's athletic competition was not a sudden, anomalous upsurge in women's interest in sports, but the enforcement of Title IX's mandate of gender equity in sports.

101 F.3d at 188 (citations omitted).

Based on the foregoing, it is ORDERED as follows:

1. Plaintiffs' Application for Preliminary Injunction and Request for Prompt Hearing (Dkt.3), filed October 9, 1997, is GRANTED.

2. Not later than December 15, 1997, Defendant shall serve and file a plan concerning how Defendant proposes to remedy the inequalities identified in this Order, given the Court's determination that a preliminary injunction should issue. Service on Plaintiffs' counsel shall be by hand delivery, telecopier transmission or overnight courier. Not later than December 18, 1997, Plaintiffs shall file and serve a memorandum in response to Defendant's proposed plan.

3. The Court will withhold issuance of a preliminary injunction pending receipt of the report identified in paragraph 2 of this Order.