Richard **LANDOW**, as next friend of Kayla Landow, as representative of a class of similarly situated persons, **Plaintiff,**

v.

**SCHOOL BOARD OF BREVARD COUNTY, Defendant.**

No. 6:97–CV–1463–ORL–22A.

United States District Court, M.D. Florida, Orlando Division.

Dec. 15, 2000.

Lisa Kuhlman Tietig, Mark E. Tietig, Tietig & Tietig, Merritt Island, FL, for Plaintiff.

Jeffrey Graham Slater, Hilyard, Bogan, Palmer & Lockeby, P.A., Michael H. Bowling, Michael M. Bell, Bell, Leeper & Roper, P.A., Orlando, FL, for Defendant.

### MEMORANDUM DECISION AND ORDER

CONWAY, District Judge.

### I. INTRODUCTION

The named plaintiff in this class action [1] is Richard Landow, next friend of his daughter, Kayla Landow, who is a member of the girls' varsity softball team at Titusville High School.[2] Landow sues the

1. On April 24, 1998, the Court certified the following class in this case: "All girls currently and directly participating in the varsity and junior varsity softball programs at the ten high schools operated by the School Board of Brevard County, and those girls who are expected to directly participate in such softball programs in the future." Doc. 29, ¶ 2, at 3.

2. The original plaintiff in this action was Daniel Daniels, as next friend of his daughters Jessica and Jennifer Daniels, who were members of the Merritt Island High School softball

School Board of Brevard County ("the School Board"), alleging disparities between girls' softball and boys' baseball programs at two high schools in Brevard County.[3] He claims that these disparities violate 20 U.S.C. § 1681 ("Title IX") and Fla. Stat. § 228.2001 ("Florida Educational Equity Act").

This case was tried by the Court, without a jury, on November 2 and December 4–5, 2000. Applying pertinent legal principles to the evidence presented, the Court determines that the inequalities between the girls' softball and boys' baseball programs at Titusville High School and Astronaut High School place the School Board in violation of Title IX and the Florida Act.

## II. FINDINGS OF FACT [4]

Approximately 70,000 students attend 97 traditional and special public schools and centers throughout Brevard County. Of the 16,000 school districts in the nation, Brevard County Public School District is the 47th largest. It employs more than 7,000 people. From north to south, Brevard County is approximately 73 miles long.

The boys' varsity and junior varsity ("J.V.") baseball teams at Titusville and Astronaut have one field on each campus; at least three of the four baseball teams conduct their practices on those fields. All four baseball teams hold their home games on campus. In contrast, the varsity and J.V. softball teams at Titusville and Astronaut practice and play at Marina Park, which is a public facility in the City of Titusville neither owned nor operated by the School Board.[5]

Marina Park has three softball fields. Each of the varsity softball teams at Titusville and Astronaut is assigned a separate field. Both schools' junior varsity softball teams share the third field, known as the practice field. The playing fields are bordered on the east by the Indian River and on the south by a marina. The fields are located 0.3 miles from U.S. Highway 1, approximately 2 miles from Titusville High School, and approximately 4 miles from the Astronaut campus.

The playing fields at Marina Park are lighted; however, due to evening usage by other groups (such as men's league and church league), the girls' softball teams rarely, if ever, play night games. Instead, they practice and play in the afternoon. Practice times vary, but typically, the girls

team. Thereafter, Rebecca Rosenbaum, on behalf of her daughter, Rachel Rosenbaum, a member of the Titusville High School varsity softball team, was substituted as the plaintiff. On November 7, 2000, the Court substituted Richard Landow as the named plaintiff.

3. The initial and first amended complaints alleged impermissible inequalities between the boys' baseball and girls' softball programs at all of the public high schools in Brevard County. *See* Docs. 1 & 5. However, on March 30, 2000, counsel substantially narrowed this case by filing the following stipulation:

The Class and the School Board stipulate and agree that considering all relevant Title IX factors, the facilities offered to girls' softball players and boys' baseball players at Bayside High School, Cocoa High School, Cocoa Beach High School, Eau Gallie High School, Melbourne High School, Merritt Island High School, Palm Bay High School, Rockledge High School and Satellite High School, are, for each

school, substantially equivalent as of January 22, 2000. As to any such differences in the facilities offered in favor of one sport or the other at such schools, such differences are not significant as of January 22, 2000. Furthermore, the parties stipulate that this lawsuit does not include any changes made to Brevard County School Board facilities after January 22, 2000.

Doc. 119. Hence, the present dispute focuses on the softball and baseball programs at Titusville High and Astronaut High.

4. Many of the facts set forth in this opinion are derived—with some editorial changes—from the "STATEMENT OF FACTS ADMITTED WHICH REQUIRE NO PROOF AT TRIAL" section of the parties' Joint Pretrial Statement. *See* Doc. 152, Attachment "H."

5. At one time, there was a girls' softball field at Astronaut. It was replaced by the boys' baseball field. The School Board offered no explanation for this at trial.

begin practicing between 3:00 and 3:30 p.m. Their games usually start at 4:00 p.m.

The on-campus baseball field at Titusville is lighted. The boys' varsity and J.V. baseball teams share that field for both practices and games. Both teams typically play at night. Start times of practices are staggered. The J.V. team usually practices first, followed by the varsity team. It is not uncommon for players on the team with the later starting time to leave campus and return for practice.

There are no lights on the baseball field at Astronaut. The varsity baseball team practices on campus. The Astronaut J.V. baseball team usually, if not always, practices off-campus at Holder Park, a municipal facility located approximately two miles from Astronaut. The J.V. team has been practicing at this location for many years. These practices typically begin at 3:00 p.m.

Marina Park is maintained by the Brevard County Parks and Recreation Department. The School Board has no control over the condition of the facilities at Marina Park, although the Board may request or suggest maintenance actions or repairs.

At Marina Park, a single shed is used by all four girls' softball teams for equipment storage. Each baseball field has considerably larger storage space for the equipment of that school's baseball teams.

The Titusville baseball teams have two batting cages; the Astronaut boys' teams have one. The girls' softball teams, however, do not have any batting cages.

The softball teams do not have access to the controls for the scoreboards at Marina Park; thus, they play without scoreboards. In contrast, both on-campus baseball fields have working scoreboards. Additionally, there is a concession stand and a press box at the Titusville baseball field. Marina Park has no press box, and the on-site concession stand is closed during girls' games. There are no such facilities at the Astronaut baseball field.

The dimensions of play for girls' high school fast-pitch softball are smaller than the dimensions of play for men's slow-pitch softball. The playing fields at Marina Park were built to men's slow-pitch dimensions. Accordingly, the girls do not actually practice and play on true fast-pitch softball fields. Since the outfield fence is farther from home plate than it would be if the field were a "dedicated" fast-pitch field, only an exceptionally powerful girls' softball player can ever experience the thrill of hitting an "over-the-fence" home run at Marina Park. Further, the presence of additional pitching "rubbers" (accommodating different leagues) on the pitchers' mounds at Marina Park creates a safety hazard for softball players.

Members of the girls' softball teams typically make personal arrangements for transportation to Marina Park. The same applies to Astronaut J.V. baseball players traveling to Holder Park. However, the School Board has instructed coaches to transport players to these off-campus facilities, if necessary.

### III. APPLICABLE LAW: TITLE IX AND THE FLORIDA ACT

Subject to exceptions not pertinent here, 20 U.S.C. § 1681(a) provides:

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]

"Congress enacted Title IX in response to its finding—after extensive hearings held in 1970 by the House Special Subcommittee on Education—of pervasive discrimination against women with respect to educational opportunities." *Cohen v. Brown University*, 101 F.3d 155, 165 (1st Cir.1996), *cert. denied*, 520 U.S. 1186, 117 S.Ct. 1469, 137 L.Ed.2d 682 (1997). "Title IX was passed with two objectives in mind: 'to avoid the use of federal resources to support discriminatory practices,' and 'to provide individual citizens effective protec-

tion against those practices.'" *Id.* (quoting *Cannon v. University of Chicago*, 441 U.S. 677, 704, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979)).

Title IX is implemented with respect to athletic activities by 34 C.F.R. § 106.41. Section 106.41(a) generally provides:

No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis.

Section 106.41(c) provides:

A recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics shall provide equal athletic opportunity for members of both sexes. In determining whether equal opportunities are available the Director will consider, among other factors:

(1) Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes;

(2) The provision of equipment and supplies;

(3) Scheduling of games and practice time;

(4) Travel and per diem allowance;

(5) Opportunity to receive coaching and academic tutoring;

(6) Assignment and compensation of coaches and tutors;

(7) Provision of locker rooms, practice and competitive facilities;

(8) Provision of medical and training facilities and services;

(9) Provision of housing and dining facilities and services;

(10) Publicity.

Unequal aggregate expenditures for members of each sex or unequal expenditures for male and female teams if a recipient operates or sponsors separate teams will not constitute noncompliance with this section, but the Assistant Secretary may consider the failure to provide necessary funds for teams for one sex in assessing equality of opportunity for members of each sex.

The Florida Act also prohibits, *inter alia,* gender discrimination in public education. It extends protection to those enrolled in public educational institutions which receive or benefit from either state or federal financial assistance. *See* Fla. Stat. § 228.2001(2)(a). The Florida Act lists the same factors for assessing discrimination as are set forth in 34 C.F.R. § 106.41(c)(1)-(10). *See* Fla. Stat. § 228.2001(3)(d)1–10. The parties have stipulated that "[f]or the purposes of this litigation, the legal analysis employed in Title IX cases is equally applicable to the Florida Educational Equity Act." Joint Pretrial Statement (Doc. 152), § X ("STATEMENT OF APPLICABLE PRINCIPLES OF LAW ON WHICH THERE IS AGREEMENT"), ¶ 4, at 5.

### IV. ANALYSIS

Preliminarily, the Court addresses the question whether the School Board's asserted failure to comply with Title IX must be evaluated from a county-wide perspective, or on a school-by-school basis. In denying the motion for a preliminary injunction filed earlier in this case, the Court stated:

Initially, the Court must determine whether it is proper to focus on alleged inequalities solely on a school-by-school basis, or whether the Court should instead evaluate the issues on a county-wide basis. In that regard, this case is markedly different from the first suit Plaintiffs initiated against the School Board. *See Daniel Daniels, etc., et al. v. School Board of Brevard County.* In the first suit, Plaintiffs challenged the School Board's compliance with Title IX at one secondary institution, MIHS. Here, by contrast, Plaintiffs claim that the School Board's treatment of girls'

softball *on a county-wide basis* violates Title IX. Under these circumstances, the Court determines that it must evaluate the girls' softball programs on a county-wide basis, rather than school-by-school. The relevant inquiry, then, is whether, considered on a county-wide basis, the School Board has provided the female high school softball players athletic opportunity equal to male baseball players. Doc. 86 at 5 (emphasis in original; footnote omitted). Since that ruling, the parties have presented further argument concerning this issue. Predictably, Plaintiff asserts that the inquiry is school-specific; the School Board, citing *Klinger v. Dept. of Corrections*, 107 F.3d 609, 615 (8th Cir. 1997), counters that its compliance must be evaluated on a county-wide basis. It is unnecessary for the Court to resolve this legal issue, because the result in this particular case is the same under either analysis: even when considered on a county-wide basis, the disparities between the softball and baseball programs at Titusville and Astronaut cause the School Board to be in violation of Title IX.

The Court also determines that evidence concerning whether the girls' softball teams have the same ability as the boys' baseball teams to raise funds through gate admission fees, concession stand revenues, and sales of advertising signs, is immaterial. Notwithstanding perceptions to the contrary among some trial witnesses, the School Board has convincingly demonstrated that the softball and baseball programs are funded equally by the School Board. Further, even though teams may engage in their own fund-raising activities, their "club accounts" are monitored by school administrators to guard against preferential treatment. That some softball players

and parents understood otherwise at the time of trial is, unfortunately, symptomatic of the lack of communication among the parties that seems to have plagued this case.

These preliminaries aside, the Court will now proceed to address the ten factors listed in 34 C.F.R. § 106.41.

A. *Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes.*

Although Plaintiff's counsel asserted otherwise during closing argument, this factor is not implicated in this suit. Plaintiff has presented no evidence establishing a disparity in this area. Additionally, the parties agreed in their Joint Pretrial Statement that "[t]here is no evidence of inequality in team numbers or player numbers." Doc. 152, Attachment "H," ¶ 56, at 7.

B. *The provision of equipment and supplies.*

Some evidence was presented concerning differences in the uniforms provided to softball and baseball players. The Court does not deem these differences, if they actually exist, to be legally significant. However, it is undisputed that the Titusville baseball teams have two batting cages, the Astronaut boys' teams have one, and the girls' softballs teams at both schools have none. In the related case of *Daniels v. School Bd. of Brevard County, Fla.*, 985 F.Supp. 1458, 1461 (M.D.Fla. 1997),[6] the undersigned judge stated: "The use of a batting cage sharpens hitting skills. The girls' softball team is technical-

---

**6.** Brought by the same plaintiff who initiated the suit at bar, *Daniels* concerned alleged inequalities between the softball and baseball programs at Merritt Island High School. In December 1997, after finding that Daniel Daniels had demonstrated a substantial likelihood of success on his claims, this Court issued a preliminary injunction requiring the School Board to remedy a number of specific inequalities associated with the girls' softball program at Merritt Island High. *Daniels* was later consolidated with the instant case. On September 12, 2000, the Court dissolved the preliminary injunction in *Daniels* and closed that case on the basis that the complaints raised therein were subsumed in the instant action and had subsequently been remedied by the School Board.

ly disadvantaged by the absence of such equipment." Coupled with the other inequalities identified in this Order, this disparity constitutes a violation of Title IX.

### C. Scheduling of games and practice time.

The Titusville baseball team has a lighted field, which gives it more flexibility in scheduling practices and games; the Titusville boys can practice and play at night, if they desire. In contrast, the Titusville softball teams cannot play at night because the Marina Park fields, while lighted, are otherwise occupied at that time. Beyond added scheduling flexibility, night games are more prestigious and offer additional benefits, as discussed in greater detail in subsection "G," *infra.* Combined with the other disparities addressed in this Order, the provision of lights for the Titusville boys, but not for the girls, violates Title IX.[7]

### D. Travel and per diem allowance.

An "admitted fact" set forth in the parties' Joint Pretrial Statement is that "[n]o travel or per diem allowance is provided to athletes in the Brevard County school system." Doc. 152, Attachment "H," ¶ 57, at 7. Hence, this factor is not implicated.

### E. Opportunity to receive coaching and academic tutoring.

Softball and baseball players enjoy equal opportunity to receive coaching. Further discussion regarding coaches is contained in subsection "F," *infra.*

The opportunity to receive academic tutoring requires greater analysis. Plaintiff contends that some girls who desire to play softball must sacrifice after-school tutoring, since practices and games take place shortly after school ends, and coaches discipline players for tardiness. However, regardless of what may have oc-

curred in the past, current School Board policy is that players on boys' and girls' teams are not disciplined for being late to practice as a result of after-school tutoring, provided they present their coach with a "pass" from the tutor. Hence, discipline is not really an issue. Nevertheless, regardless of disciplinary consequences, the possibility exists that a softball player who elects to receive after-school tutoring may miss a substantial enough portion of practice that her standing on the team may be diminished or jeopardized. However, the same circumstance faces the players on those baseball teams that practice immediately after class ends. Plaintiff argues that the softball players are disproportionately affected by this problem because they must leave campus as soon as school ends, since their practices and games are played some distance from campus. However, the Astronaut J.V. baseball team also practices off-campus.

In any event, this issue remains largely theoretical; Plaintiff has not presented sufficient proof of differential treatment or disparate impact to warrant injunctive relief on this point. One former softball player did testify that she decided to quit the team in part because she could not obtain after-school tutoring and still arrive on time at practice. However, Plaintiff presented no proof on this subject beyond this one witness and her mother; no evidence was introduced that this is a widespread problem or that it impacted more than this single family. Further, as noted in subsection "G," *infra,* Plaintiff now concedes that the provision of off-campus facilities alone does not violate Title IX. If students who practice and play off-campus shortly after classes end have less time to spend with tutors than those who practice and play on campus shortly after school, that is unfortunate, but it does not necessarily violate Title IX. With its limited budget and resources, the school district

---

**7.** Since the fields used by the Astronaut baseball players have no lights, the Astronaut girls

are not similarly disadvantaged.

cannot be expected to resolve each and every conflict between academics and sports. Absent a more substantial showing, the Court is unwilling to rule that this potential collision between tutoring and athletics violates Title IX.

### F. Assignment and compensation of coaches and tutors.

The parties have agreed that "[c]ompensation of coaches for softball and baseball in Brevard County is identical." Doc. 152, Attachment "H," ¶ 58, at 7. Additionally, the softball and baseball coaches attend two clinics per year; there is no preferential treatment in this area. Although some witnesses offered their lay opinions at trial that the baseball coaches were more knowledgeable and skilled than their softball counterparts, the Court does not find any differences in this regard to be legally significant for Title IX purposes. The School Board is not obligated to ensure absolute parity in coaching ability. The softball coaches are sufficiently competent for Title IX purposes, particularly given the relative success of the girls' teams. Finally, Plaintiff has not shown that the assignment and compensation of tutors is an issue.

### G. Provision of locker rooms, practice and competitive facilities.

The issue of practice and competitive facilities is at the very heart of this case. The Court must agree with defense counsel that the impetus for this lawsuit was the lack of on-campus softball fields. In that regard, the First Amended Class Action Complaint states: "The ultimate example of unequal facilities is that three out of the ten Brevard County public high schools have a boys' baseball field on their campus, while those same three schools have no girls' softball field on their campus." Doc. 5, ¶ 10, at 3. This theme continued through the filing of the parties' Joint Pretrial Statement, which contained the following "admitted fact":

With respect to the two high schools in Brevard County which the Plaintiffs maintain cause the School Board to fail to comply with Title IX, the primary, though not exclusive, matter in dispute concerns the issue of on-campus/off-campus facilities. Both Titusville High School and Astronaut High School each have an on-campus baseball field. The girls' softball players at these Titusville high schools, practice and play off campus at Marina Park, a Brevard County-maintained and City of Titusville-owned facility.

Doc. 152, Attachment "H," ¶ 46, at 5–6. However, by the time of trial, Plaintiff's counsel had retreated from that position, admitting in closing argument that the provision of off-campus facilities to girls' softball teams and on-campus fields to boys' baseball teams does not alone constitute a Title IX violation.

This is not the end of the matter, however. While the main thrust of this suit concerned the off-campus fields, Plaintiff has identified other significant disparities regarding practice and competitive facilities. The most substantial of these disparities is the simple fact that while the boys' teams have "dedicated" fields with dimensions correct for their sport, the girls' teams do not. Instead, the softball teams are forced to "make do" by playing on fields that are built to the dimensions of a different sport: men's slow-pitch softball. This signals to the girls that they are not as important as the boys. As noted in the findings of fact, since the outfield fence is farther from home plate at Marina Park than it should be for girls' fast-pitch play, only an exceptional girls' softball player can clear that fence with a home run. Additionally, the pitchers' mounds at Marina Park, with their multiple pitching rubbers, pose a safety hazard not present on the boys' fields.

The significant problem of different field dimensions is exacerbated by other aspects of Marina Park. It is clear from the testimony at trial that the Marina facility is not

as nice as the on-campus fields used by the boys' teams. This is not a simple matter of aesthetics, however. Evidence was presented that beer bottles, needles, "joints" and condoms have been found in the Marina dugouts. There was testimony that persons—presumably transients—have been discovered sleeping in the dugouts. Additionally, girls' softball players and their family members must endure comments of a sexual nature by male spectators and passers by. Male softball players waiting to take the field sometimes express impatience when the girls' games do not end on time. These men communicate their frustration by making comments or by tapping their watches to signal that the girls' time is up. This is not to suggest that the School Board has an obligation to control the behavior of these third parties; however, the Board does have the power to choose the places where its students engage in athletic activities.

Moreover, the girls do not have a scoreboard available to them, while the boys' baseball teams do. As the undersigned judge noted in *Daniels:*

> A scoreboard is of obvious benefit to players who must keep track of the score, the innings, and the numbers of outs, balls and strikes at any given moment. The prestige factor of a scoreboard is also obvious.... [T]he fact that the boys have a scoreboard and the girls do not sends a clear message to players, fellow students, teachers and the community at large, that girls' varsity softball is not as worthy as boys' varsity baseball.

985 F.Supp. at 1460–61. Further, the Titusville boys enjoy the prestige of playing night games, while the Titusville girls do not. This Court also addressed the importance of this factor in *Daniels:*

> Nighttime play affects spectator attendance, parental involvement, and player and spectator enjoyment. Nighttime

games have a "big league" quality not associated with daytime play. Additionally, lighting affords more flexibility regarding practice scheduling. The absence of lighting on the girls' softball field detrimentally affects the girls' team in all these respects.

*Id.* at 1461.

Additionally, the softball teams are provided with significantly less storage space than the baseball teams, and all four girls' teams must share a single storage shed at Marina Park. The baseball fields have dedicated pitching warm-up areas; there are no such facilities at Marina. The Titusville baseball field has a concession stand and a press box; in contrast, Marina does not have a press box and its concession stand is unavailable to the softball players. Moreover, while perhaps not otherwise of critical significance, the dugouts at Marina Park are in such relatively substandard condition when compared to those provided the boys' baseball teams that, when considered along with the more serious disparities under a "totality of the circumstances" approach, they buttress the conclusion that the School Board is treating the softball teams unequally. Similarly, the restrooms at Marina Park are sufficiently inferior to those at the Titusville baseball field that they contribute to the violation of Title IX. In contrast, the restroom at the Astronaut baseball field, which consists of a portable toilet, is inferior to the restrooms at Marina Park. In this limited area, the Astronaut softball players enjoy an advantage over their baseball counterparts.[8]

The remaining factor in 34 C.F.R. § 106.41(c)(7) is the provision of locker facilities. Although some trial witnesses believed otherwise, the evidence established that the on-campus locker rooms are closed at the end of the school day. Hence, they are not ordinarily available to

---

8. Issues regarding parking at Marina Park are not sufficiently significant to warrant discussion. Testimony concerning bleacher seating

was sufficiently murky that the Court cannot determine whether a disparity actually exists.

baseball players desiring to "dress out" for on-campus practices and games. As a result, the boys do not enjoy preferential treatment in the provision of locker facilities. Similarly, although there was much testimony at trial about the lack of security at Marina Park, the Court finds that the baseball teams receive no actual preference in that area. Simply put, no security is provided for the boys' practices and games. The presence of the much-discussed on-campus security trailers is incidental, and has no connection with baseball activities. The persons who occupy those trailers are responsible for ensuring that the campuses are secure after the last school employees leave, generally around 10:00 p.m. Hence, their duties do not actually begin until after baseball games and practices have ended.

### H. Provision of medical and training facilities and services.

The provision of training facilities (as distinguished from practice and competitive facilities) and services is not an issue. As regards medical facilities and services, the suggestion that the boys' teams have access to the school clinics when practicing and playing on campus is without merit. Trial testimony established that these clinics close shortly after school ends. Even if the clinics were available, they contain only the most basic medical supplies. These supplies do not surpass anything in the first aid kits the School Board furnishes to the boys' and girls' coaches on an equal basis. Additionally, although there was considerable discussion at trial that the sometimes inoperative pay phone at Marina Park posed a risk that medical help might not be timely summoned in the event of an emergency, the School Board has mooted this contingency by furnishing cellular phones to the softball coaches. Finally, while there was some evidence presented that ice may not always be available at softball practices and games, Plaintiff has not proved that the problem is sufficiently pervasive that it amounts to a Title IX violation.

### I. Provision of housing and dining facilities and services.

The parties have agreed in the Joint Pretrial Statement that "[n]o housing or dining facilities and services are provided to either boys' baseball or girls' softball players." Doc. 152, Attachment "H," ¶ 59, at 7. As a result, this factor need not be addressed.

### J. Publicity.

The School Board established at trial that softball and baseball games are publicized equally at school. Moreover, the girls' teams are currently able to display team banners and advertising banners at Marina Park during the playing season. Although it appears that school colors and mascots are prominently displayed at the on-campus baseball fields, Plaintiff has not demonstrated that any disparity in this regard is sufficiently significant to rise to the level of a Title IX violation.

## V. CONCLUSION

While the School Board has taken steps to remedy the inequalities associated with its girls' softball programs—particularly after the injunction was issued in *Daniels*—it has not yet fully succeeded. The Court is not unsympathetic to the fact that the School Board operates under a tight budget, and that the Board must select from a number of legitimate competing priorities in deciding how to spend the tax dollars allocated to it. However, Title IX is the law; it must be followed. Plaintiff correctly notes that the School Board has had decades to make the changes mandated by Title IX, yet it has not done so.

On the other hand, it appears that the climate of hostility surrounding this lawsuit has in some part resulted from miscommunication, misunderstanding and mistrust. As defense counsel observed in closing argument, some of the issues about which Plaintiff complains in this suit—such as relating to transportation—might have

been resolved had players or parents "just asked." Other problems might have been solved had players—or, more realistically, their parents—pursued them above the coaching level, with school administrators. However, it is undeniable that players and their parents *did* ask the School Board to correct the more significant disparities identified in this Order, but not all were remedied.

Defense counsel also suggested that Plaintiff's attorneys were "making mountains out of molehills" with respect to some of the asserted disparities. This characterization overlooks an undeniable aspect of human nature: matters that might otherwise be accurately characterized as molehills can assume mountainous proportions when viewed from the perspective of someone who is already subjected to disparate treatment. In other words, persons who already perceive that they are viewed with less esteem than their peers understandably may consider with resentment and suspicion circumstances and conduct that might ordinarily seem less sinister.

These observations aside, the Court determines that the School Board has violated Title IX and the Florida Educational Equity Act in the manner specified in this Order, entitling the plaintiff class to a preliminary injunction. Consequently, the Court will require the School Board to remedy the violations identified in this Order. However, before issuing an injunction, the Court desires additional input from the parties concerning the specific manner in which these inequalities should be corrected. Accordingly, mindful that public funds are at stake, the Court will follow its approach in *Daniels* and require the parties to submit plans addressing in detail how, and within what time frame, the inequalities identified in this Order should be remedied. As noted in *Daniels*, such an approach has been recognized by other courts. *See Cohen v. Brown University*, 101 F.3d 155, 185–88 (1st Cir.1996), *cert. denied*, 520 U.S. 1186, 117 S.Ct. 1469, 137 L.Ed.2d 682 (1997).

Based on the foregoing, it is ORDERED as follows:

1. The School Board shall immediately begin working on a plan to remedy the inequalities specified in this Order. The Court expects the Board to develop a plan that elevates the girls' softball programs at Titusville and Astronaut to the level enjoyed by the boys' baseball teams at those schools. The School Board should not propose a course of action that imposes "separate disadvantage" upon the girls' and boys' programs, as the Board initially attempted to do in response to the Court's decision on the motion for preliminary injunction in *Daniels*.

2. Not later than February 1, 2001, counsel for the parties shall meet in person at a mutually convenient location in a good faith effort to determine whether they can agree upon a single plan for remedying the inequalities addressed in this Order.

3. Not later than March 15, 2001, the parties shall either file a joint plan with the Court, or file and serve separate proposed plans.

4. If the parties submit separate proposed plans, each party may serve and file a response to its opponent's plan not later than April 2, 2001.